517 F.2d 398
 Fed. Sec. L. Rep. P 94,914
Renee SLADE, Plaintiff-Appellee,
v.
SHEARSON, HAMMILL & CO., INC., Defendant, Third-Party
Plaintiff-Appellant,
v.
NATIONAL BANK OF NORTH AMERICA, Third-Party Defendant.
Edward E. ODETTE, Plaintiff-Appellee,
v.
NATIONAL BANK OF NORTH AMERICA, Third-Party Defendant.
 No. 115, Docket 74-1537.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 21, 1974.
Decided Dec. 16, 1974.
 
 Russel H. Beatie, Jr., Dewey, Ballantine, Bushby, Palmer & Wood, New York City (David J. Goss, New York City, of counsel), for appellant.
 Abraham L. Pomerantz, Pomerantz, Levy, Haudek & Block, New York City, (Mordecai Rosenfeld, Richard M. Meyer, New York City, of counsel), for appellee.
 Lawrence E. Nerheim, Gen. Counsel, S.E.C. (David Ferber, Sol., Jacob H. Stillman, Asst. Gen. Counsel, James H. Schropp, Atty., Washington, D. C., of counsel), for Securities & Exchange Commission as amicus curiae.
 Donald M. Feuerstein and Wachtell, Lipton, Rosen & Katz, New York City (Martin Lipton, Herbert M. Wachtell, Steven M. Barna, Robert B. Mazur, New York City, of counsel), for Salomon Brothers as amicus curiae.
 Sam Scott Miller, New York City, and Hill, Christopher & Phillips, P. C., Washington, D. C. (Richard M. Phillips, Gilbert C. Miller, Alan J. Berkeley, Washington, D. C., of counsel), for Paine, Webber, Jackson & Curtis, Inc., as amicus curiae.
 Before MOORE, OAKES and GURFEIN, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 Is an investment banker/securities broker who receives adverse material nonpublic information about an investment banking client precluded from soliciting customers for that client's securities on the basis of public information which (because of its possession of inside information) it knows to be false or misleading?
 
 
 2
 This intriguing question, "certified" to us under the provisions of 28 U.S.C. § 1292(b)[1] has been briefed not only by the opposing parties but by three amici curiae, each of which has taken a different position in response not only to the "certified" question but to related questions. The case itself has tremendous implications both for the securities industry and the investing public, as it involves questions some resolutions of which Judge Carter recognized in his Memorandum Opinion of March 18, 1974, could make it "exceedingly difficult for any (brokerage firm) to function as an investment banker for a company and at the same time function as a broker-dealer in that company's securities." And, too, a decision in this case might possibly even have impacts in the banking business where bank trust departments are effectuating transactions in securities of companies with which the bank has a commercial banking relationship. See generally Herman & Safanda, The Commercial Bank Trust Department and the "Wall," 14 B.C.Ind. & Comm.L.Rev. 21 (1972).
 
 
 3
 We would not be required to answer the precise question certified by the district court since the certification statute does not require it; the certificate to the appellate court is that there is a controlling question of law, but the interlocutory appeal is from the order made below. We have already said that there is substantial ground for difference of opinion as to the question or questions involved, and we will assume that the immediate appeal, if we were to render a proper complex of answers, might materially advance the ultimate termination of the litigation. For a variety of reasons, nevertheless, we are of the view that permission for the interlocutory appeal in this case from an order of the United States District Court for the Southern District of New York, Robert L. Carter, Judge, denying a motion for partial summary judgment by the defendant-appellee was improvidently granted.[2]
 
 
 4
 There are, as will be seen, at least three factual questions which have a bearing on what is the precise question of law presented by the case. Their resolution may make the question "certified" not the controlling question in any event. Beyond this there may well be no single broad answer which can be given either to the question certified or to the various questions briefed; rather, a case by case determination based upon the individual facts and factors involved, in addition to the policies then applicable, will, as we now see it, likely be necessary. In short, this is precisely the kind of case in which the implications are so considerable and the issues so complex that in the proper exercise of judicial restraint, an abstract answer to an abstract question is the least desirable of judicial solutions. Thus, we decline to answer the question certified or to make any other decision on the law of this case, and we remand for further action of the district court, in no way expressing approval or disapproval of Judge Carter's order below or his memorandum of opinion in connection therewith.
 
 
 5
 It would perhaps be sufficient for us to stop with what we have said, but in the light of the grant of permission for the interlocutory appeal we wish to spell out a little further exactly what is involved so that our rather unusual order of remand may be better understood.
 
 
 6
 This case involves two separate consolidated class actions brought by purchasers of the stock of Tidal Marine International Corp. (Tidal Marine) under the antifraud provisions of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated pursuant thereto, 17 C.F.R. 240.10b-5 (1974). The actions complain that Shearson, Hammill & Co., Inc. (Shearson), was an investment banker to Tidal Marine and that it came into possession of material adverse information about Tidal Marine and nevertheless promoted the sale of Tidal Marine stock to brokerage customers including the assorted plaintiffs.
 
 
 7
 Shearson has a Corporate Finance Department which performs its investment banking functions and a Retail Sales Organization which handles its broker-dealer transactions for the firm's public customers. Shearson claims that according to its internal policies and procedures the corporate finance department is prohibited from releasing any information about one of its investment banking clients to the retail sales organization and the firm's public customers until the information is made publicly available by the company. The retail sales organization is administered separately from the investment banking department and Shearson's claim is that its "investment executives" or security salesmen are permitted to "solicit" purchases and sales of securities on the basis of their own analysis of public available information including the securities of concerns for which Shearson is acting as investment banker.
 
 
 8
 Shearson claims that its policy prohibited the "recommendation" of securities issued by investment banking clients and that the firm never "recommended" Tidal Marine and did not put it on its "master buy" list. Shearson claims that its sales of Tidal stock by its retail sales organization to various customers, including the plaintiff-appellees, were purely on the basis of favorable public information. Shearson further claims that its investment banking department did not come into the possession of material adverse information about Tidal until May of 1972, several weeks after the last of plaintiff-appellees' purchases, and that pursuant both to its policy of nondisclosure and in conformity with its fiduciary relationship to its investment banking customer, Tidal, Shearson did not disclose this information either to the general public or to its customers or to its own retail sales force by virtue of its internal policy which includes the maintenance of a so-called "Chinese wall" between its investment banking department and its sales department, the policy thereby prohibiting the interdepartmental flow of information. In any event, Shearson's claim is that upon advice to Tidal that Shearson would be required to disclose the adverse information a shortage of cash following upon damages to Tidal's fleet of ships that were not covered by insurance Tidal finally made a public disclosure of the cash shortage, together with its negotiations, with its lenders and its decline in unaudited earnings, following which Shearson terminated its investment banking relationship.
 
 
 9
 The plaintiff-appellees, on the other hand, assert that Shearson either knew or was chargeable with knowledge of adverse facts about Tidal prior to the purchases of securities by plaintiff-appellees and that, as opposed to a strict "Chinese wall" erected to prevent the retail sales department from knowing what the investment banking department knew, there were at least four instances of the transmission of bullish information concerning Tidal from Shearson's investment banking department to its retail salesmen: these instances included wires[3] touting the stock and referring to the expansion of Tidal's fleet and net income, economies of size, its successful maintenance of its vessels and its ability to secure borrowings. Beyond this plaintiff-appellees claim that Shearson's policy required its salesmen to use the content of the wires when they discussed Tidal with their customers. And the plaintiff-appellees take issue with the "recommendation"/"solicitation" distinction proposed by Shearson, contending that Shearson violated its own policy not to recommend securities by permitting its salesmen to solicit their purchase on the strength of the favorable information transmitted from Shearson's investment banking department. Finally, plaintiff-appellees suggest that there is an even further conflict of interest on the part of Shearson in that it was also acting as the principal market maker in Tidal stock. Plaintiff-appellees argue that Shearson thus had a motive to continue recommending Tidal stock while concealing unfavorable information.[4]
 
 
 10
 There are, then, at least three separate factual issues which are unresolved; thus, to answer the legal questions presented would require an exposition sufficiently broad to cover the various factual ramifications that may occur, an exposition which we are not prepared to give. The first of these is whether the material adverse information was received before or after the last of the plaintiff-appellees' purchases. The certified question assumes that at the time the transactions in question took place Shearson knew the material inside information, but if Shearson's contention is correct its liability might well be nonexistent and the entire question certified would be postponed until further litigation. Secondly, while Shearson claims that there was a solid "Chinese wall," that is to say, an effective separation of its two departments, which might in a given instance call for one answer to the legal questions raised, the appellants claim that in this case there was no effective separation of departments, and that misleading favorable information was given the retail sales department by the investment banking department, possibly to protect Shearson's position as the principal market maker for Tidal's stock. This claim, if substantiated, would put a different complexion on the case and might in a given situation call for plain and simple application of basic principles of fraud.
 
 
 11
 Lastly, the extent to which there is a difference between "solicitation" and "recommendation" in connection with the purchase of securities may have a bearing. Salomon Brothers, like the plaintiff-appellees, argues that the facts of this case present a situation where the transaction was not merely "solicited" but was affirmatively "recommended" and argues that the "mere solicitation" of transactions in circumstances where no recommendation is made should not be prohibited where there is an effective "Chinese wall."[5] The Securities Exchange Commission believes that if the situation implies an "affirmative representation," the solicitation should be prohibited but that this would presumably not be the case in "block trading" or "market making" transactions not involving express or implied opinions or representations. The amicus brief of Paine, Webber, Jackson & Curtis, Inc. (Paine, Webber), suggests that Salomon is not significantly engaged in the business of "recommending" securities to its customers so that if only "recommendation" were prohibited, but "solicitation" were not, Salomon, which acts as a principal for its own account and not simply as a broker for others, would be competitively favored over such firms as Paine, Webber. That is to say, Paine, Webber argues that there is no legitimate basis either in law or in policy for the suggested distinction between "recommendation" and "solicitation," one that is put forth interestingly enough both by the defendant-appellant Shearson on the one hand and Salomon Brothers on the other hand.
 
 
 12
 The parties and amici have as much difficulty spelling out the legal questions that are here involved and which it is suggested we answer in the abstract. Shearson contends that the federal securities laws and particularly SEC v. Texas Gulf Sulphur, 401 F.2d 833, 847-48 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), precluded it from using nonpublic information for the benefit of its own customers and that the district court's decision on the motion for partial summary judgment applies to facts materially different from the case at hand. The plaintiff-appellees assert that Shearson's excuse that the inside information rule forbade it from ordering its salesmen to desist from a selling campaign which is mulcting its own customers is a perversion of the rule and permits fraud on the public. The SEC, pointing out that the case involves at least two important principles, first that persons who have been given material undisclosed information may not take advantage of it in the market,[6] and, second, that brokers must treat their customers fairly, apparently looks favorably upon the erection of a proper "Chinese wall," see Merrill Lynch, Pierce, Fenner & Smith, Inc. (1967-69), CCH Fed.Sec.L.Rep. P 77,629 (1968). But cf. Van Alstyne Noel & Co., 33 SEC 311, 321 (1952); and see Cady Roberts & Co., 40 SEC 907 (1961). But the Commission expresses concern with extending Texas Gulf so as to make a rule which would preclude a brokerage firm from having any transactions with or on behalf of customers in the securities of the companies with which it has investment banking relationships. The SEC suggests that through the use of a device such as a "restricted list" issued inside the company, outstanding recommendations could be withdrawn and further recommendations prevented.
 
 
 13
 Salomon, which seconds the SEC with regard to the use of restricted lists, further argues that in any event the sales department of a brokerage firm may not affirmatively recommend and promote the purchase of a security based upon public information known to the investment banking department to be false. The SEC's position is disputed, however, by Paine, Webber which suggests that it is misleading in its simplicity and would have drastic and far-reaching consequences for the securities industry. According to Paine, Webber the Commission's proposal ignores the critically important "research" function of an investment banking firm and fails to recognize that since the function of an investment banker is to underwrite an offering of securities it must necessarily "recommend" the securities being underwritten and, indeed, may well have an obligation to "serve as a sponsor in the trading market" for the issue being underwritten.
 
 
 14
 Thus, it is plain that what we have here is not one legal question that has been certified, but a complexity of interlocking questions the answers to which may vastly affect the operations of one of the most important financial businesses in the country, the securities business, as well as the investment public being protected and the various enterprises whose securities are being underwritten and traded. Inside information problems can arise in the context of a multiplicity of various functions performed by brokerage firms and in a multiplicity of factual contexts. These differing contexts may well involve different considerations and may require different solutions.
 
 
 15
 It would be the height of judicial folly, we think, to attempt on an indeterminate factual record to make an abstract exposition that would adequately cover the various contexts and reach the proper overall results, however desirable this might be for the guidance of the business or however judicially challenging such an exposition might be. It is altogether possible that some of the questions may not be reached for some time to come or may follow from previous case by case determinations. It may well be that some of the solutions to the questions asked may be reached in entirely different decision making bodies than the courts. Meanwhile, fully appreciating the importance of this court's decisions to the world of commerce, we have determined to proceed on a case to case basis and, as we have indicated above, to await in this case full findings of fact and a consequent narrowing of the issues.
 
 
 16
 Case remanded in accordance with opinion; costs to neither party.
 
 
 
 [1]
 28 U.S.C. § 1292(b):
 When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.
 This section derives from the Interlocutory Appeals Act of 1958, Sept. 2, 1958, Pub.L. No. 85-919, 72 Stat. 1770. It was recommended by the Judicial Conference and represents a compromise between those who would permit interlocutory appeals at the sole discretion of the appellate courts and those who were opposed to any broadening of interlocutory review. See Wright, Federal Courts 462 & nn. 43 & 44.
 
 
 [2]
 In fairness to my colleagues sitting on this panel it should be noted that neither was on the panel granting the certificate; the writer of this opinion was one of the 2-1 majority that did so, failing perhaps to appreciate the multiplicity of issues involved
 
 
 [3]
 Shearson counters by saying that all wires are reviewed by the Corporate Finance Department to be sure that they are based entirely on public information
 
 
 [4]
 If, as plaintiff-appellees maintain, Shearson obtained the material adverse information much earlier than Shearson now contends, Shearson as principal market maker would have been selling substantial quantities of Tidal which it owned in its own right while at the same time buying for its customers
 
 
 [5]
 Whether block trading technically involves "solicitation" while not involving a "recommendation" of the security in question is another issue the amici would have us answer
 
 
 [6]
 In this case, there is no claim that Shearson took advantage of any adverse information it possessed by recommending that its clients sell Tidal stock on the basis of the undisclosed information