Gilbert **TUCKER** et al., Plaintiffs,

v.

**ARTHUR ANDERSEN & CO.,** Defendant.

**ARTHUR ANDERSEN & CO.,** Defendant and Third-Party Plaintiff,

v.

Joseph A. **BONURA** et al., Third-Party Defendants.

No. 73 Civ. 4259 (HFW).

United States District Court, S. D. New York.

May 22, 1975.

Edward Labaton, Joel C. Feffer, Shatzkin, Cooper, Labaton & Bandler, Paul Katcher, New York City, for plaintiffs.

William M. Bradner, Jr., John A. Stichter, Rigdon H. Boykin, Dunnington, Bartholow & Miller, New York City, Charles W. Boand, Wilson & McIlvaine, Chicago, Ill., for defendant and third-party plaintiff Arthur A. Andersen & Co.

## OPINION AND ORDER

WERKER, District Judge.

Sprouting and multiplying "like the leaves of the green bay tree"[1] class actions have paralleled the rapid growth and expansion of private litigation for violations of Section 10(b) of the Securities Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10(b)–5). Courts are still in the nascent stages of defining the contours of the substantive element of 10b–5 claims and of forming meaningful standards for class action certification. When a 10b–5 claim is framed in the procedural context of a class action the problems facing the district judge are compounded.[2] This case exemplifies many of those problems.

### BACKGROUND

As purchasers of the stock of Bermec Corporation ("Bermec") formerly known as Berman Leasing Corporation, plaintiffs seek to represent a class of all purchasers of Bermec stock between September 26, 1968 and November 1, 1969. The defendant is the independent public accounting firm of Arthur Andersen & Co. ("Andersen") which prepared and certified consolidated financial statements for Bermec and Black Watch Farms, Inc. ("Black Watch"), a wholly owned subsidiary of Bermec,. for the fiscal year ending June 30, 1968. These financial statements appeared in a Bermec 1968 Annual Report and in a 1968 Bermec Proxy statement.

It is alleged that during the year 1968, Black Watch, in attempts to raise funds for its operations, caused improper, false and fictitious entries to be made on its books and records so as to exaggerate its assets and income, (Complaint, ¶ 11) and that Andersen in preparing, issuing and certifying the financial statements aided and abetted Black Watch in its fraudulent course of conduct (Complaint ¶ 12), all in violation of Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)), Section 10(b), Rule 10b–5 and the common law of fraud and deceit. In order to comprehend the nature and extent of the allegations against Andersen, a more detailed description of the pleadings, affidavits and exhibits is required.[3]

---

1. *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973) (Eisen III).

2. Certification of class actions in 10(b)–5 cases has led to charges that the substantive rights of defendants have been prejudiced for the sake of procedural innovation. *See* American College of Trial Lawyers, Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure 15–21 (1972); Note, The Impact of Class Actions on Rule 10(b)–5, 38 Univ.Chi.L.Rev. 337 (1971).

3. Of course the description of the pleadings, briefs and exhibits submitted do not constitute final findings of fact by this court. There are also two other actions pending in this district which relate to many of the same facts. One of those is pending before this

At the time of the transactions involved, Bermec was a publicly held corporation with shares traded on the New York Stock Exchange and whose primary business had been the leasing of heavy trucks and tractor-trailers. In June, 1968 Black Watch was organized as a wholly owned subsidiary of Bermec to acquire both the general and limited partners interests in Black Watch Farms, a New York limited partnership.[4] Black Watch was engaged in the breeding of pure-bred Aberdeen Angus cattle which were sold primarily to high-income investors for tax shelter purposes, with Black Watch agreeing to care for the herd for a management fee. The fraudulent conduct on the part of Black Watch which plaintiffs allege Andersen aided and abetted centered around the activities of Black Watch's former president, Jack R. Dick ("Dick"), who prior to June 30, 1968 had embezzled in excess of $3,000,000 from Black Watch.

Dick's embezzlement scheme was premised on the use of official (cashier's) checks as a means of paying the Black Watch cattle suppliers. Black Watch would receive invoices from its suppliers which would show the number of cattle purchased and the price. The invoices were paid in installments by cashier's checks purchased from County National' Bank (now Empire National Bank). Apparently Dick was able to intercept the actual invoices addressed to Black Watch by its suppliers, substitute forged invoices at amounts substantially higher ·than the actual purchase price,[5] pay the suppliers with some of the cashier's checks and misappropriate the balance for himself.

Plaintiffs allege that Andersen breached its duty to the investing public in two respects. First, they contend that if Andersen had used proper auditing procedures in preparing the June 30, 1968 Bermec and Black Watch financial statements it would have uncovered Dick's defalcations. By failing to uncover the scheme, Andersen is alleged to have certified false and misleading financial statements. Specifically, plaintiffs allege that because of Andersen's improper auditing procedures, the 1968 financial statements contained misrepresentations and omissions of material facts in that they:

(a) materially overstated the value of the inventory of livestock and breeding herd;

(b) materially overstated the value of accounts and notes receivable payable by herd owners in that inadequate reserves were provided for losses, costs and expenses which could be, or should have been, anticipated would result from bad debts, collection expenses, breaches of warranty with respect to the sale of cattle to herd owners and failure to fulfill contractual obligations and other commitments

---

court, *State Mutual Life Assurance Co.* v. *Arthur Andersen & Co.* (see 65 F.R.D. 518 (S.D.N.Y.1975) for a description of that action), the other is *Rosen* v. *Dick*, 73 Civ. 2388, an action brought by the Bermec Corporation trustee in Reorganization.

4. On May 13, 1968, Bermec announced that it had agreed in principle to acquire, in exchange for stock, a 57 percent interest in Black Watch Farms. According to Andersen the acquisition was accomplished in two stages. The 57 percent partnership interest was acquired from Jack R. Dick, founder of Black Watch, for 116,000 shares of convertible preferred stock and the assumption of

certain liabilities. As a second step, Bermec filed a registration statement with the SEC and purchased the remaining partnership interests primarily for Bermec common stock. The partnership was apparently dissolved in August, 1969, and its assets and liabilities were taken over by Black Watch (Complaint ¶ 5).

5. Plaintiffs claim that cattle were purchased for about $750 each and resold for $3500. The false invoices would show a charge of $1,750 to Black Watch so that Dick allegedly embezzled $1,000 on each cow. *See* Plaintiff's Reply Memorandum of Law at 3–4; Andersen's Memorandum in Opposition at 11, 20.

made to herd owners in connection with the purchase of cattle;

(c) materially overstated net income by understating the cost of goods sold (sale of cattle) as a result of the overvaluation of the inventory of livestock and the failure to charge or reserve against such earnings sufficient amounts to cover the losses, costs and expenses described in subparagraph (b) above;

(d) failed to reveal and concealed that officers of Black Watch had made false entries and alterations in the books of Black Watch; and

(e) failed to reveal and concealed that the books and records of Black Watch, the methods of maintenance of such books and records and the absence of adequate internal controls in connection therewith, were such that defendant could not, consistent with sound and generally accepted accounting principles, issue a certification as to such financial statements. (Complaint, ¶ 14).

It is further alleged that the market price of Bermec stock was artificially inflated as the result of the financial statements certified by the defendant and distributed to the shareholders, press and general public.

Plaintiffs also claim that by April 1969, Andersen became aware of Dick's embezzlements,[6] but instead of informing the Securities and Exchange Commission and the investing public that the June 30, 1968 financial statements were inaccurate, Andersen decided to "cover-up" the scheme.

Andersen, for its part, claims that the procedures followed in preparing the 1968 financial statements were fully in accord with generally accepted auditing standards and that it neither discovered, became aware of, nor suspected any instance of fraud, defalcation, or other similar irregularities during the conduct of its audit. Andersen does admit that it became aware of Dick's scheme in April 1969, but explains its failure to make the facts known to the public and to adjust the 1968 financials by stating its conclusion (the basis of which is discussed *infra*) that there would have been no net effect on the 1968 financials due to Dick's misappropriations—the accounting effect "was similar to a loss which have been covered by insurance."

## RULE 23 REQUIREMENTS

In considering whether plaintiffs have met the requirements of Rule 23 the court must keep in mind the "admonition of liberality" toward securities class actions. *Korn* v. *Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir. 1972); *Green* v. *Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969); *In re Caesars Palace Securities Litigation*, 360 F.Supp. 366, 395 (S.D.N.Y.1973). Indeed as plaintiffs note, and as defendants candidly admit, class action status in 10b–5 cases has often been granted.[7]

6. Andersen admits that by April 15, 1969 it was aware of Dick's fictitious invoice scheme. Andersen has filed a third-party complaint against Jack R. Dick; Joseph A. Bonura, the former comptroller and chief financial officer of Black Watch Farms; Empire National Bank (as successor in interest to County National Bank) and Herman L. Meckler the former chairman and chief executive of Bermec. After the filing of its third-party complaint Andersen was permitted to add three additional third-party defendants—Aristocrat Angus Ranch, Ben R. Houston and Charles D. Alexander. Andersen claims that these third-party defend-

ants deliberately and knowingly withheld and concealed from Andersen facts relating to the Dick scheme.

7. *See, e. g., Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Korn v. Franchard Corp.*, 456 F.2d 1206 (2d Cir. 1972); *In re Caesars Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973); *Wolfson v. Solomon*, 54 F.R.D. 584 (S.D.N.Y. 1972); *Herbst v. Able*, 47 F.R.D. 11 (S.D. N.Y.1969); *Fischer v. Kletz*, 41 F.R.D. 377 S.D.N.Y.1966).

Of course, it does take more than *ipse dixit* to make a class, *Professional Adjusting Systems* v. *General Adjustment Bureau*, 64 F.R.D. 35 (S.D.N.Y.1974), thus the plaintiff must show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition, when an action, such as this case, seeks to be maintained under Rule 23(b)(3), the court must find that (5) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (6) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. These latter two requirements include the problem of "manageability" which "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen* v. *Carlisle and Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 2146, 40 L.Ed.2d 732 (1974) (Eisen IV).

■ Andersen does not dispute, and the court finds, that the requirements of (1) numerosity and (2) the existence of common question of law and fact have been met. Plaintiffs have alleged that in excess of 1,000 persons purchased Bermac stock during the period in question. Andersen has supplied more specific information which shows that during the trading period involved, over 9,000,000 shares of Bermec (adjusted for a 3-for-1 stock split) were traded on the open market. If the typical class member purchased 300 shares over the period there would be over 30,000 class members, far too many to make joinder of all members practicable. The common questions of law and fact include, but are not limited to, (1) whether the 1968 financial statements were false and misleading; (2) whether Andersen knew, or should have known, that the statements were false and misleading; (3) whether Andersen ever had actual knowledge of the Dick scheme, and (4) if Andersen did have actual knowledge, what were the nature and extent of its obligations as an independent auditor in making public the existence of the scheme and the adjustments that would be necessary to the 1968 financial statements. In addition, the court finds that the superiority requirement is met since the "abundance of authorities sustains the superiority of a class action in cases brought under the securities laws." *Wolfson* v. *Solomon*, 54 F.R.D. 584, 592 (S.D.N.Y.1972), and since there are a large number of persons allegedly injured, *Green* v. *Wolf, supra,* 406 F.2d at 301, who may not otherwise seek recovery. *Korn* v. *Franchard, supra,* 456 F. 2d at 1214.

As is typical in many 10b–5 class actions, the challenge to certification centers on the "predominance" requirement of Rule 23(b)(3). Specifically, Andersen claims that individual issues concerning the materiality of the alleged misrepresentations and omissions in the 1968 financial statements, reliance, and the damages suffered by each plaintiff, predominate over any of the common issues and make any purported class action unmanageable. Should this court decide to certify a class, Andersen would then seek to limit the class by showing that certain members would not be fairly and adequately represented and that the representative parties' claims would not be typical of other segments of the class. To decide these questions not only must the standards developed under Rule 23 be examined but also some comment must be made on the substantive law applicable to 10b–5 claims.

*Materiality*

■ Andersen contends that each class member will have to prove separately how any alleged misrepresenta-

tions and omissions were material to him, *i. e.*, that the circumstances surrounding each purchase by each member of the class must be examined to determine materiality. The court does not agree. *In Chris-Craft Industries, Inc.* v. *Piper Aircraft Corp.*, 480 F.2d 341, 362–63 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) the court discussed materiality as follows:

> The concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell. We articulated the materiality standard in *List* v. *Fashion Park, Inc.*, 340 F.2d 457, 462 (2 Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), to be "whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.' " The materiality test is concerned only with whether a prototype reasonable investor would have relied. *See Heit* v. *Weitzen*, 402 F.2d 909, 912–14 (2 Cir. 1968), *cert. denied* 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). Account must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest. (footnote omitted) (citation omitted).

Materiality then is viewed as an objective rather than a subjective standard. *See Affiliated Ute Citizens* v. *United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Mills* v. *Electric Auto-Lite Co.*, 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).[8] The "surrounding circumstances" must be examined to determine whether a *reasonable* investor, not the individual investor, would attach importance to the alleged misrepresentation or omission.

Anticipating that the court would find materiality to be a common issue to be analyzed on an objective basis, Andersen proffers the alternative argument that plaintiffs cannot present a homogeneous class because materiality would vary over time. This argument flows from Andersen's assertion that over the period specified in the complaint a number of events transpired which would make any adjustment in the 1968 financials immaterial to the reasonable investor. A detailed analysis of possible accounting adjustments to the 1968 financial statements is presented by Andersen in its brief. The bottom line of this analysis is Andersen's conclusion that the maximum reduction in Black Watch earnings for fiscal 1968 resulting from plaintiffs' allegations would have been $1,386,500. This would reduce Black Watch's 1968 earnings from $7,236,495, to $5,849,995, a figure still higher than the $4,874,437 reported income for the year ended December 31, 1967, and the $1,620,072 income figure for the year ended December 31, 1966. The adjustment to the Bermec's 1968 financials would have been to increase its reported loss to $4,681,807 from $2,891,502.[9] Any reasonable investor, it is argued, would

---

8. While *Mills* involved § 14(a) of the Exchange Act and *Chris-Craft* involved § 14(e), "many of the controlling principles applicable [to Section 10(b) and Rule 10(b)–5] have been enunciated in cases arising under other provisions of the 1934 Act." *Shapiro* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 235 n. 12 (2d Cir. 1974).

There is some conflict as to whether the proper standard for materiality should be phrased in terms of whether the reasonable man might have—as opposed to would have—considered the misrepresentation or omission important in making his investment decision. See the discussion in *Broder* v. *Dane*, 384 F. Supp. 1312, 1320–21 (S.D.N.Y.1974).

9. Andersen presented these figures as well as the Black Watch figures in its memorandum after a detailed discussion of possible hypothetical accounting adjustments that would have to be made to the 1968 financial statements due to overpricing of cattle and certain settlements with herdowners.

have to consider the impact of these adjustments in light of other public information which was relevant to his investment decision.

The public information alluded to above consisted of interim earnings reports issued on November 8, 1968, February 14, May 15, 1969 and the report for the fiscal year ended June 30, 1969 which was issued October 21, 1969. In addition there were public announcements that: (1) the SEC had required Black Watch to register its herd program as a security under the Securities Act of 1933;[10] (2) Bermec would be acquiring several new companies;[11] (3) Congress would be enacting tax reform legislation which might effect Black Watch's operations;[12] and (4) Black Watch would be sold to State Mutual Life Assurance Company.[13] With all this information available to the investing public, Andersen argues that any adjustments to the 1968 financials would be immaterial or, assuming that they were material at the beginning of the class period, they would subsequently become immaterial as each bit of information or combination of information became known to the public. The net result being that the significance of the alleged misrepresentations and omissions would depend at what point during the class period the purchase of Bermec stock was made.

Plaintiffs' response to these arguments is twofold. They first argue that the dollar impact of the adjustments to the 1968 financial statements was material and, irrespective of that dollar impact, the investors in Bermec were entitled to know that a massive fraud had been perpetrated on Black Watch, a fact which might be material to the reasonable investor. Second, plaintiffs contend that the existence of other material facts during the class period does not mean that the alleged misrepresentations and omissions were not themselves material.[14]

10. This announcement was contained in a six-month earnings report issued to Bermec shareholders on February 14, 1969. Before Bermec gained control of Black Watch Andersen states that herds were marketed in packages consisting of 10 pedigreed Aberdeen Angus cows, priced at $3,500 each, with breeding rights to the Black Watch battery of championship bulls. After Bermec took over control, a new program was instituted where the herdowner purchased 36 cows at $2,500 each and a one-third interest in a bull for $100,000. The minimum investment under the new program was $100,000, a fact which apparently failed to persuade the SEC that registration was unnecessary.

11. These included: (1) An announcement on April 12, 1969, that Bermec had agreed in principle to acquire Hawaiian Pacific Industries for $15,000,000 in Bermec stock (this agreement was terminated on May 23, 1969); (2) An agreement to acquire Motor Transportation Service Systems, Inc. announced to the public on May 19, 1969; and (3) Announcement by Meckler on July 30, 1969 that the Bermec Board had approved the acquisition of Ventures, Inc. and Henry End Associates.

12. Tax Reform Legislation was submitted to Congress by then President Nixon on April

21, 1969. Included among the proposals was a modification of "farm income" which would jeopardize Black Watch's tax-shelter attraction. Tentative decisions on tax Reform were made public by the House Ways and Means Committee on May 22, 1969. The Tax Reform Act of 1969 was passed by the House on August 7, 1969. On January 7, 1970 Bermec announced that Black Watch had discontinued the sale of managed breeding herds pending an evaluation of the Tax Reform Act of 1969.

13. The sale to State Mutual is the subject of another lawsuit pending before this court. For a description of some of the facts in that case see *State Mutual Life Assurance Co. v. Arthur Andersen & Co.*, 65 F.R.D. 518 (S.D.N.Y.1975).

14. In support of their argument, plaintiffs cite several cases where actions were permitted to proceed on behalf of persons who purchased securities over an extended period of time. See *Green v. Wolf, supra; Werfel v. Kramarsky*, 61 F.R.D. 674 (S.D.N.Y. 1974); *In re Caesars Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973); *Grad v. Memorex*, 61 F.R.D. 88 (N.D.Cal. 1973); *Siegel v. Realty Equities Corp.*, 54 F.R.D. 420 (S.D.N.Y.1972); *In re Penn Central Securities Litigation*, 347 F.Supp.

On this motion for class certification the court cannot delve into the merits of the complaint and rule whether or not the alleged misrepresentations and omissions were material. *Eisen IV, supra*, 417 U.S. at 177, 94 S.Ct. 2140. If at a subsequent point in the litigation Andersen is able to demonstrate that the misrepresentations and omissions, in light of other information, were not material, then the court under the flexibility provided in Rule 23(c)(1) *Green v. Wolf, supra*, 406 F.2d at 298, could alter or amend any class certification order to narrow the class to those who purchased during the period when there was materiality. The question of materiality for the purposes of this motion rather than being an individual issue is in fact a common issue.

*Reliance*

According to Andersen, each member of the purported class must prove that he relied on the misrepresentations and omissions in the 1968 financials when making his decision to purchase Bermec stock. Reliance then will become a predominating individual issue which will make any class action unmanageable. Plaintiffs dispute this argument and contend that to the extent there are material omissions in the 1968 financial statements reliance is not required. As to any material misrepresentations, since the purchases of stock were made on the open market plaintiffs argue that reliance can be shown by a "fraud on

the market" theory. The arguments of the parties are obviously poles apart and underscore the difficulty facing litigants and the courts in interpreting the reliance requirement of Rule 10b–5, especially in the class action context.[15]

One solution which provides a short answer to Andersen's contentions is to bifurcate the action and proceed to trial on all the common elements and then, if necessary, have individual trials on the reliance issue. This approach has been the accepted view in this Circuit for if it were not followed:

> "It would negate any attempted class action under Rule 10(b)–5, since as the District Courts have recognized, reliance is an issue lurking in every 10(b)–5 action."

*Green v. Wolf, supra*, 406 F.2d at 301 (citation omitted). While bifurcation continues to be an accepted solution to the reliance issue,[16] it has not been without criticism. *See* American College of Trial Lawyers, Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure, 8–10 (1972); Simon, Class Actions—Useful Tool Or Engine of Destruction, 55 F.R.D. 382–83 (1972). Perhaps the most succinct statement of the issue was made by Judge Williams in *Grad v. Memorex*, 61 F.R.D. 88, 98–99 (N.D.Cal.1973).

> "Use of the bifurcation method, however, does not resolve what appears to be an inherent conflict be-

---

1327 (E.D.Pa.1972), aff'd, 494 F.2d 528 (3d Cir. 1974); *Rosenblatt v. Omega Equities Corp.*, 50 F.R.D. 61 (S.D.N.Y.1970); *Weiss v. Tenney Corp.*, 47 F.R.D. 283 (S.D.N.Y. 1969); *Fogel v. Wolfgang*, 47 F.R.D. 213 (S.D.N.Y.1969); *Dolgow v. Andersen*, 43 F.R.D. 472 (E.D.N.Y.1968); *Kronenberg v. Hotel Governor Clinton, Inc.*, 41 F.R.D. 42 (S.D.N.Y.1966).

15. The problem of reliance was noted in the Advisory Committee Notes to Amended Rule 23: "[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the

need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." 39 F.R.D. 69, 103 (1966).

16. *See Korn v. Franchard Corp., supra*, 456 F.2d at 1212–13. *See also Herbst v. International Telephone & Telegraph Corp.*, 495 F.2d 1308, 1315 (2d Cir. 1974).

tween proof of the reliance element of a 10b–5 action and the 'predominance of common issues' requirement of Rule 23(b)(3); it merely *delays* resolution of the problem until a later date. But this delay in effect prohibits the court from affirmatively finding that the cause is *manageable* as a class action as required by Rule 23(b)(3)(D). That is, if actual individual reliance in its common law sense need be proven by each class member, the trial of that issue, even at a later stage in the proceedings, would tax the court's (and counsels') resources to an intolerable extent. Accordingly, the court is constrained to deal with the reliance enigma at the outset in making its determination of whether a class should be certified." (emphasis original).

There are potentially 30,000 members in the proposed class. Before the court makes any decision to bifurcate the issues and face "[t]he harrowing experience of administering a multitude of individual trials of individual claims," [17] the developing case law in Rule 10b–5 cases should be examined to see if other solutions are available.

■■■■ Requiring reliance (and materiality) as a prerequisite to recovery serves "to restrict the potentially limit-less thrust of Rule 10b–5 to these situations in which there exists a causation in fact between the act and injury." *Titan Group, Inc.* v. *Faggen*, 513 F.2d 234 (2d Cir., 1975) *citing Globus* v. *Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), and *List* v. *Fashion Park, Inc.*, 340 F.2d 457 (2d Cir.), *cert. denied, sub nom. List* v. *Lerner*, 382 U.S. 811, 86 S.Ct. 23, 15 L. Ed.2d 60 (1965). *See also* 2 A. Bromberg, Securities Law, Fraud—Rule 10b–5, § 8.6 at 209 (1974). Thus reliance is defined in terms of common law tort principles as "whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss.'" *List* v. *Fashion Park, Inc.*, supra, 340 F.2d at 462, and is used interchangeably with the concept of "causation." *See, e. g.*, *Shapiro* v. *Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 495 F.2d 228, 239 (2d Cir. 1974); *Siegel* v. *Realty Equities Corp.*, 54 F.R.D. 420, 424 (S.D.N.Y. 1972). *See also Competitive Associates* v. *Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir., 1975). More recently, reliance has been described in terms of "transaction causation." *Schlick* v. *Penn-Dixie Cement Corp.*, 507 F.2d 374, 381–82 (2d Cir. 1974).[18] Whatever the definition, plain-

17. *Morris* v. *Burchard*, 51 F.R.D. 530, 536 (S.D.N.Y.1971).

18. In *Schlick*, the court in *dicta* noted that if a 10(b)–5 case is based solely upon material omissions or misstatements in proxy materials then "there would have to be a showing of both *loss causation*—that the misrepresentations or omissions caused the economic harm—and transaction causation—that the violations in question caused the appellant to engage in the transaction in question." 507 F.2d at 380. In a footnote the court stated the following: "In terms of transaction causation, other methods of conceptualizing the same issue include the doctrines of reliance, materiality and the buyer-seller requirement." *Id.* at n. 11 (citations omitted). The court went on to elaborate on the differences between the two types of causa-tion: "the former [loss causation] is demonstrated rather easily by proof of some form of economic damage, here, the unfair exchange ratio, which arguably would have been fairer had the basis for valuation been disclosed. Transaction causation requires substantially more. In a misrepresentation case, to show transaction causation a plaintiff must demonstrate that he relied on the misrepresentations in question when he entered into the transaction which caused him harm. 2 Bromberg § 8.6, at 209–11. In an omission or nondisclosure case based upon Rule 10b–5, a plaintiff need not show reliance in order to show transaction causation but must still show that the facts in question were material 'in the sense that a reasonable investigator might have considered them important' in making his investment decisions." *Id.* at 380–81 (citations omitted). In his

tiffs must show a causal connection between the alleged misrepresentation and omissions and their injury.

■ Citing the Supreme Court's decision in *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), plaintiffs argue that to the extent they allege material omissions in their complaint reliance is not an element of their claim. Plaintiffs are not entirely incorrect. In *Ute*, the Supreme Court stated that:

> [u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. 406 U.S. at 153–54, 92 S.Ct. at 1472.

This language has recently been interpreted in this Circuit in *Titan Group, Inc.* v. *Faggen, supra*, 513 F.2d at 238, as follows:

> [R]ather than abolishing reliance as a prerequisite to recovery, [the Supreme Court] was recognizing the frequent difficulty in *proving*, as a practical matter, that the alleged misrepresentation, allegedly relied upon, caused the injury. . . . Causation remains a necessary element in a private action for damages under Rule 10(b)–5." (citations omitted) (emphasis original).

Since in a nondisclosure case "reliance has little if any rational rule, 2 A. Bromberg, *supra* at 209, causation in fact is presumed by a showing of materiality. *See, e. g., Shapiro, supra*, 495 F.2d at 238; *Chris-Craft Industries, Inc.* v. *Piper Aircraft Corp., supra*, 480 F.2d at 374; Note, the Reliance Requirement in Private Actions Under SEC Rule 10b–5, 88 Harv.L.Rev. 584, 590–92 (1975) [hereinafter cited as Reliance Note]. Plaintiffs allege two material omissions in their complaint—(1) concealment of Dick's embezzlement scheme after its discovery and (2) failure to disclose that Black Watch Farms, Inc. and Bermec lacked adequate financial controls. While expressing no view as whether either alleged omission may ultimately form a basis of liability—except to say as to the latter a definitive answer may be forthcoming, *see Hochfelder* v. *Ernst & Ernst*, 503 F.2d 1100 (7th Cir. 1974), *cert. granted*, 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 773 (1975)—reliance will not be an individual issue since causation may be presumed if the plaintiffs can prove the materiality of the alleged nondisclosures.[19]

In addition to omissions, the plaintiffs have also alleged affirmative misrepresentations in their complaint as previously detailed. It is alleged that the combination of the misrepresentations and omissions produced a "fraud on the market" in that Bermec stock was trading at an artificially inflated price. In

concurring opinion Judge Frankel was "not convinced at this time that the Circuit ought to be committed to [the use of the terms "loss causation" and "transaction causation"] . . . or to their still uncertain implications." *Id.* at 384.

19. Finding a "presumption" of reliance from a showing of materiality raises the question of whether such a presumption is conclusive or rebuttable. In *Chris-Craft* Judge Mansfield was adamant in stating that the presumption should be conclusive. 480 F.2d 341, 400 (Mansfield, J., concurring in part and

dissenting in part). This view differs from that of commentators who favor rebuttability. See 2 A. Bromberg, *supra* § 8.6 at 212; Reliance Note, *supra* at 597–602. In a case subsequent to *Chris-Craft* Judge Lumbard commented on Judge Mansfield's position as follows: "Neither the majority in *Chris-Craft* nor the Supreme Court in *Mills* or *Ute* remanded those cases for the purpose of allowing defendants to raise such a defense." *Herbst* v. *International Telephone & Telegraph Corp.*, 495 F.2d 1308, 1316 (2d Cir. 1974).

such cases, where the purchases of stock were made in impersonal, indirect transactions, it is argued that as in the case of nondisclosure, reliance should be presumed once materiality is shown. *See* 2 A. Bromberg, *supra* § 8.6 at 212; Reliance Note, *supra* at 592–96. In discussing both *Affiliated Ute* and *Mills* v. *Electric Auto-Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); the second circuit has recognized that "under certain circumstances; for example, if a material omission *or misstatement* is proven, a presumption may be raised that the plaintiff relied on the deception to his detriment." *Chris-Craft Industries, Inc.* v. *Piper Aircraft Corp., supra,* 480 F.2d at 357 (emphasis added). In the context of discussing the causation requirement of Rule 10b–5 the court in *Chris-Craft* noted the following:

> "Where the transaction is accomplished through *impersonal dealings, such as on a stock exchange,* or for some other reason the factors that influenced the parties are not readily apparent, the decisions have discussed liability in terms of the 'materiality' of the misrepresentation . . . This constructive reliance principle is particularly appropriate in class actions where proof of actual reliance by numerous class members would be impracticable." 480 F.2d at 374 (emphasis added) (citations omitted).

■ Allowing a presumption of reliance by a showing of materiality—*i. e.,* constructive reliance—in cases involving open market transactions follows the same reasoning as allowing such a presumption in cases of nondisclosure. In both instances there are practical difficulties in proving reliance. In "fraud on the market" cases—as opposed to face-to-face dealings—the causation requirement can be satisfied if plaintiffs can show that the misrepresentations affected the market (artificial price inflation) and damaged the plaintiffs. As in cases of nondisclosure, proof of materiality leads to a logical inference of reliance. If the reasonable investor would have been influenced to purchase by the alleged material misrepresentations and omissions then many traders in the market may have been similarly influenced. *See Reliance Note, supra* at 593–94.

■ Justification for the use of a presumption of reliance in open market transactions need not, and indeed should not, be premised on the bringing of the 10b–5 suit as a class action, for this would raise a serious question of modification of substantive rights in violation of the Rules Enabling Act, 28 U.S.C. § 2072 (1970). Rather, such a presumption can be based on the developing law in 10b–5 cases as exemplified by *Affiliated Ute.* As Judge Williams noted in *Grad* v. *Memorex, supra,* 61 F.R.D. at 100–101:

> "In recent years a more realistic definition of the reliance requirement has evolved, the use of which permits huge securities cases to proceed under Rule 23(b)(3), yet assures fairness to the defendant. By use of an objective standard of reliance, focusing on a 'causal nexus' between the alleged misstatements and an inflated price upon which plaintiffs relied, the court (and jury) is freed from the overwhelming task of examining the subjective intent of each class member in his decision with respect to his stock.
>
> This approach to the reliance element is not as revolutionary as defendants warn, nor does it destroy substantive rights as they have been defined in past decisions. As noted above, even in common law fraud actions, it is *causation* that is the basis of what we refer to as reliance.
>
> \* \* \* \* \* \*
>
> If it is demonstrated that the Memorex documents materially misrepresented the financial status of the corporation and that the market responded thereto in a manner that the stock can be said to have been 'inflated',

and that it was reasonable for an investor to rely thereon, then a sufficient showing of a causal connection between the misrepresentations and the purchases by class members will have been made." (emphasis original).

*See also Siegel* v. *Realty Equities Corp.,* 54 F.R.D. 420, 424–25 (S.D.N.Y.1972); *Reeder* v. *Mastercraft Electronics Corp.,* 363 F.Supp. 574, 581 (S.D.N.Y.1973); *In Re U.S. Financial Securities Litigation,* 64 F.R.D. 443, 450–51 (S.D.Cal. 1974); *Gold* v. *DCL Inc.* [1973–74 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,036 (S.D.N.Y.1973).

*Damages and Alleged Conflicts Within the Class*

 In order to recover damages, plaintiffs must show a "causal link" between the alleged misrepresentations and omissions and the artificially inflated price of Bermec stock. *Cutner* v. *Fried,* 373 F.Supp. 4, 12 (S.D.N.Y. 1974). While part of the causation requirement is concerned with issues of reliance and materiality, the concept also encompasses a showing of some form of economic damage. *Schlick* v. *Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir. 1974) ("loss causation"). *See also* 2 A. Bromberg, *supra* § 8.7(1) at 213–220. The proving of a "causal link" and the calculation of damages may prove to be a difficult task in this case because of the host of factors which affect the market price of a stock. Certainly the use of expert testimony may be required. *See, e. g., Reeder* v. *Mastercraft, supra,* 363 F.Supp. at 579–581. *See also Chris-Craft Industries, Inc.* v. *Piper Aircraft Corp.,* 516 F.2d 172 (2d Cir., 1975) (calculations of damages for violations of § 14(e)). It would seem highly imprudent at this point to deny class certification because it may be difficult to prove damages. A separate trial or hearing on the damage issue is possible. *Green* v. *Wolf, supra,* 406 F.2d at 301. *Cutner* v. *Fried, supra,* 373 F.Supp. at 12. *See also* 2 A. Bromberg, *supra* § 8.7(2) at 220. As one court has observed:

"In many instances, damages become a mere matter of administering a formula derived from the resolution of the issue of liability. Consequently, damages do not pose the same problem that is presented by the issue of reliance . . . ."

*Morris* v. *Burchard,* 51 F.R.D. 530, 536 (S.D.N.Y.1970).

 The more serious question raised by Andersen relates to possible conflicts that may exist if and when this litigation reaches the point of calculating damages. The proposed class period runs from September 26, 1968 to November 1, 1969, with purchases and sales by the named plaintiffs at several different points during the period.[20] By the end of the period the market price of Bermec had dropped considerably and on November 6, 1970, Bermec ceased to be traded on the New York Stock Exchange.[21] This decrease becomes significant because Andersen alleges that

---

20. Plaintiffs Albert and Adelaide Segal bought 50 shares of Bermec on September 26, 1968 at 70¼; 100 shares on April 11, 1969 at 16; sold 150 shares on July 21, 1969 at 13⅝ and bought 100 shares on October 11, 1969 at 8⅜. During 1969, Gilbert Tucker bought 600 shares on April 16 at 15; sold 300 on October 9, 1969 at 7⅝ and sold 300 shares on October 18, 1969 at 8½, while Lucille Tucker bought 600 shares on April 23, 1969 at 14¾, sold 300 on October 9, 1969 at 7⅝; and sold 300 on October 16 at 8½. Plaintiffs Larry and Edwina Krutick were dismissed from the action for failure to answer interrogatories. Plaintiff Moses Katcher purchased his shares between April 15 and April 21, 1969.

21. On September 26, 1968 Bermec closed at a price of 71. Apparently the high point during the class period was reached on December 10, 1968 when it was traded at 90½. From there the stock declined (there was a 3 for 1 split on January 8th—with closing price on January 7 of 73¾ and January 9 of 24) until by October 31, 1969 the stock was trading at 9¼.

the public did not become aware of any defect in the 1968 financials until an article appeared in the *Wall Street Journal* on September 9, 1971. Thus, all during the proposed class period, the market was allegedly unaware of any defect in the financials, and if Bermec stock was inflated it remained inflated throughout the period. Based on this fact, Andersen would have this court eliminate from any class all those who both purchased and sold prior to public awareness of any defect in the 1968 financials, since, it is alleged, they would have suffered no damage for any "inflation" paid for at the time of purchase would be recouped at the time of sale.[22] Andersen also claims that failure to eliminate those who both purchased and sold during the class period could create conflicts among class members. For example, a class member who purchased after September 26, 1968 and sold on March 1, 1969 would try to minimize any "inflation" factor on the date of sale, whereas, one who purchased on March 1, 1969 would try to maximize any "inflation" factor. Andersen's conflict argument does have merit. But this is not the time to eliminate class members or define with precision how damages may be calculated in this lawsuit. Should a point come where there is a genuine conflict, a proper procedure would be to form appropriate subclasses. *See, e. g., B & B Investment Club* v. *Kleinert's Inc.,* 62 F.R.D. 140, 144 (E.D.Pa.1974); *Feldman* v. *Lifton,* 64 F.R.D. 539, 549 (S.D.N.Y.1974).

By Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), plaintiffs may recover "actual damages." Andersen is correct when it asserts that damages under section 28(a) have generally been defined by an "out of pocket" rule—*i. e.,* the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. *Estate Counseling Service* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 533 (10th Cir. 1962). *See also Abrahamson* v. *Fleschner,* 392 F.Supp. 740 (S.D.N.Y. 1975). *See generally,* Note, the Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities, 26 Stanford L.Rev. 371, 383–85 (1974). Using such a rule of damages, "actual value" may be calculated by looking to the market price when the misrepresentation or omission is "cured." *See* 3 A. Bromberg, *supra* ¶ 9.1 at 228. When as here, the "cure" allegedly did not occur until at least September 9, 1971, it will be difficult to measure damages since other factors will have influenced the price of Bermec stock. Courts have on occasion used other methods for calculating damages due to 10b–5 violations. *See Chasins* v. *Smith, Barney & Co.,* 438 F.2d 1167, 1173 (2d Cir. 1970), (difference between purchase price and amount received on resale). *See also Myzel* v. *Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Sarlie* v. *E. L. Bruce Co.,* 265 F.Supp. 371 (S.D.N.Y. 1967). It may well be that if plaintiffs prevail on their theory of liability and Andersen's theory of damages is applied, a number of class members may be shown to have suffered no damage. That fact does not, and should not, prevent the court from certifying a class provided all the Rule 23 requirements are met. As already indicated, if genuine conflicts develop in the damage issue or if some portion of the class cannot recover damages, subclasses may be formed or the class order modified.[23]

---

22. A similar attempt to eliminate those who both purchased and sold prior to disclosure of the true facts was rejected by this court in *Handwerger* v. *Ginsberg,* CCH Fed.Sec. L.Rep. ¶ 94,934 (S.D.N.Y. January 2, 1975).

Andersen was a defendant in that case and has filed an appeal from the court's order certifying a class.

23. At this point the court cannot say that there are any genuinely antagonistic interest

Andersen would also divide the class based on certain events already discussed—Bermec's settlement with Dick on April 15, 1969; the tax message to Congress on April 21, 1969 and announcement of the sale of Black Watch to State Mutual on October 9, 1969. It is argued that the claims of those who purchased before any one of these events would not be typical of those who purchased after. Yet plaintiffs have alleged that the 1968 financials were inaccurate throughout the class period and that Andersen did not at any time during the period disclose the true facts. *Cf. Aboudi* v. *Daroff,* 65 F.R.D. 388, 391–92 (S.D.N.Y.1974). If after any of these events the alleged misrepresentations and omissions were no longer material then at that time the class can be limited. At this moment it cannot be said as a matter of law that plaintiffs' claims are atypical of other class members.

Having discussed the arguments put forth by Andersen on the predominance requirement it is the court's conclusion that common questions predominate over individual questions. Moreover, as of this moment it appears that the claims of the representative parties are typical of the claims of the class and that plaintiffs will fairly and adequately protect the interests of the class. While Andersen's arguments have shown that plaintiffs may have a long and difficult path to travel before they can recover on their claims, the court concludes that plaintiffs have met all the requirements of Rule 23 and a class consisting of all those persons who purchased the common stock of Bermec corporation between September 26, 1968 and November 1, 1969 will be certified.

Within thirty (30) days from the signing of this Order plaintiffs are to complete discovery as to the names and addresses of class members, and are to submit an Order in accordance with this decision and in the form recommended in the Manual for Complex Litigation § 1.45 at 159 together with a form of notice and a form of exclusion request.

*Certification under 28 U.S.C. § 1292(b)*

In *Eisen* v. *Carlisle & Jacquelin,* 370 F.2d 119 (2d Cir. 1966), *cert. denied,* 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) (Eisen I), this Circuit developed the "death knell" doctrine for review of denial of class action certification. Since that time the question of whether any order *granting* or denying class action status is a final appealable order under 28 U.S.C. § 1291 has, in the words of Chief Judge Kaufman, "received an inordinate amount of scrutiny by circuit courts." *Kohn* v. *Royall, Koegel* and *Wells,* 496 F.2d 1094 (2d Cir. 1974) (footnote omitted). As recent decisions in this Circuit have indicated, not every order of a district court which grants class action certification can be reviewed under § 1291. *Compare General Motors Corp.* v. *City of New York,* 501 F.2d 639 (2d Cir. 1974), and *Kohn, supra, with Herbst* v. *International Telephone and Telegraph Corp.,* 495 F.2d 1308 (2d Cir. 1974).

As already discussed in this opinion, the main thrust of Andersen's arguments against class certification was aimed at the "predominance" requirement of Rule 23(b)(3), specifically issues of materiality, reliance and damages. Since so few orders granting class certification reach the appellate stage, there is little guidance offered to the district judge in interpreting the "predominance" requirement. The importance of appellate review of this and other requirements of Rule 23 was recently outlined in some trenchant comments by Judge Mansfield in his concurring opinion in *General Motors Corp.* v.

present such as were found in *Free World Foreign Cars, Inc.* v. *Alfa Romeo S.P.A.,* 55

F.R.D. 26 (S.D.N.Y.1972), and *Wood* v. *Rex-Noreco, Inc.,* 61 F.R.D. 669 (S.D.N.Y.1973).

*City of New York,* 501 F.2d 639, 659–60 (2d Cir. 1974):

"For these enormously important threshold decisions, which determine whether the class action genie is to be released from the bottle, the district courts need guidance. Instead, because so few class action determinations ever reach the point of appellate review, the trial judges are asked to 'fly by the seat of their pants.' Despite the passage of seven years since the adoption of Rule 23, except in one or two instances . . . we have yet to provide any meaningful guidelines interpreting key terms used in the Rule, such as 'predominate' and 'superior' found in (b)(3) and 'as soon as practicable' in (c)(1). As a result, district judges, left to fend for themselves, have adopted varying individual standards. We cannot disregard the fact that some judges, possibly influenced by our early exhortations to take a liberal view of the Rule, have tended to 'jump the gun' by making an early determination in favor of a class certification without benefit of adequate data."

In addition to review under § 1291, 28 U.S.C. § 1292(b) allows review of certain interlocutory orders of the district court.[24] Professor Kaplan was of the view that at least in the early period of interpretation of Rule 23, section 1292(b) might be an appropriate vehicle for appellate review of class action orders. Kaplan, Continuing Work of the Civil Committee—1966 Amendments of the Federal Rules of Civil Procedure, 81 Harv.L.Rev. 356, 390 n. 131 (1967). *See also* Report of the ABA Special Committee on the Federal Rules of Procedure, 38 F.R.D. 95, 104–05 (1966). While most of the cases in this Circuit are concerned with review under section 1291, some cases have at least implied that review under § 1292(b) might be proper. *See Caceres* v. *International Air Transport Association,* 422 F.2d 141, 144 (2d Cir. 1970); *Kohn, supra,* 496 F.2d at 1096 n. 9, citing *Zahn* v. *International Paper Co.,* 53 F.R.D. 430, 434 (D.Vt.1971), *aff'd,* 469 F.2d 1033 (2d Cir. 1972), *aff'd,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).[25] Other circuits have used section 1292(b) for review of orders which either granted or denied class action certification.[26]

Problems with the use of section 1292(b) for review of class action orders center around the prerequisites for 1292(b) certification, *i. e.,*—whether (1) the order involves a "controlling" question of law; (2) there is a substantial ground for difference of opinion; and (3) an immediate appeal would materially advance the ultimate termination of

24. 28 U.S.C. § 1292(b) (1970) provides: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order (emphasis original).

25. *Herbst, supra,* 495 F.2d at 1313 n. 9, Judge Lumbard remarked: "We think that there ought to be a right to appeal rather than reliance on the discretion of the district court to grant the certificate under 28 U.S.C. § 1292(b)."

26. *See, e. g., Katz* v. *Carte Blanche Corp.,* 496 F.2d 747 (3d Cir. 1974) (en banc), *cert. denied,* 43 U.S.L.W. 3213 (U.S. October 15, 1974); *Kline* v. *Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir. 1974); *Kamm* v. *California City Development Co.,* 509 F.2d 205 (9th Cir. 1975); *In Re Hotel Telephone Charges,* 500 F.2d 86 (9th Cir. 1974). *See also Samuel* v. *University of Pittsburgh,* 506 F.2d 355, 360–61 (3d Cir. 1974).

the litigation. *See generally*, Note, Interlocutory Appeals In The Federal Courts Under 28 U.S.C. § 1292(b), 88 Harv.L.Rev. 607, 630–31 n. 97 (1975). A comprehensive discussion of these requirements can be had by comparing the majority and dissenting opinions in *Katz v. Carte Blanche Corporation*, 496 F.2d 747 (3d Cir. 1974) (en banc), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L. Ed.2d 125 (1974). In the context of discussing the "controlling" question of law requirement, the *Katz* majority concluded:

"The determination of what orders are properly reviewable under § 1292(b) must be made by a practical application of those policies, not be a mechanical application of labels such as 'discretionary' or 'nondiscretionary.' Those policies, both before and since the enactment of § 1292(b) have included the avoidance of harm to a party pendente lite from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense." 496 F. 2d at 756.

This court is of the opinion that its order certifying a class can properly be described as a "controlling question." Reversal may very well mean the discontinuance of the lawsuit. Moreover if the litigation were "decertified" both the court and the parties would not be faced with managing the many facets of the class action, thus saving considerable time and resources of all concerned. Certainly it can be said that there is a considerable ground for difference of opinion on this court's reasoning in certifying the class. If the court's order were reversed protracted and expensive litigation may very well be avoided which could result in a material advancement of the termination of the litigation. *See Bersch* v. *Drexel Firestone, Inc.*, 519 F.2d 974, (2d Cir. 1975). This case may very well fit the requirement of the "exceptional" or "big" case which courts have read into § 1292(b). *Milbert* v. *Bison Laboratories,*

*Inc.*, 260 F.2d 431 (3d Cir. 1958); *Bobolakis* v. *Compania Panamena Maritima San Gerassimo*, 168 F.Supp. 236, 239 (S.D.N.Y.1958); *Gottesman* v. *General Motors Corp.*, 268 F.2d 194, 196 (2d Cir. 1959). *See also McKillop* v. *Regents of the University of California*, 386 F. Supp. 1270, 1279–80 (N.D.Cal.1975).

Finally, it must be determined what question is to be certified. One possibility is to certify whether or not the court was correct in certifying a class. But in order to avoid any "abstract expositions," *see Slade* v. *Shearson Hammill Co.*, 517 F.2d 398 (2d Cir. 1974) and to define the question as precisely as possible, the court will certify, *sua sponte* (*see Kinzler* v. *New York Stock Exchange*, 62 F.R.D. 196 (S.D.N.Y.1974)), the following questions:

"Was the district court correct in concluding that issues of materiality, reliance and damages in the context of this case were not individual issues which would defeat the "predominance" requirement of Rule 23(b)(3) and make this action unmanageable as a class action?"

And as a second question:

"Was the district court correct in refusing at this time to eliminate from the class those who sold their Bermec stock prior to any public disclosure of the Jack Dick fraud?"

Of course the circuit court would not be limited to the four corners of the certificate and may certainly declare its own views on any aspect of the court's order. *Bersch* v. *Drexel Firestone, Inc., supra*, 519 F.2d at 993–995.

As is obvious from this opinion, this court supports a more liberal approach for the use of § 1292(b) as a means of appellate review of class action orders. Some guidance on the class action issue and on the use of 1292(b) for review purposes is needed. Should the circuit court refuse certification it is urged, with all due respect, that some statement of the reasons for refusing certification be made. *Compare, e. g. Kinzler,*

*supra* (certification refused Feb. 28, 1974, in a memorandum order). *See also* Redish, The Pragmatic Approach to Appealability in the Federal Courts, 75 Col.L.Rev. 89, 127 n. 207 (1975).

The court's order certifying the class will be stayed until either (1) the circuit court refuses to accept the certification or (2) certification is accepted and a decision is filed.

So ordered.