Thomas J. **REEDER** et al., Plaintiffs,

v.

**MASTERCRAFT ELECTRONICS COR-
PORATION** et al., Defendants.

No. 68 Civ. 5007.

United States District Court,
S. D. New York.

Aug. 22, 1973.

Silverman & Harnes, New York City, for plaintiffs; Sidney B. Silverman, New York City, of counsel.

Charles Sutton, for Mastercraft Electronics Corp. and Al Dayon.

H. John Gluskin, New York City, pro se.

## OPINION

ROBERT J. WARD, District Judge.

In 1968 plaintiffs each purchased common stock of defendant Mastercraft Electronics Corporation ("Mastercraft"), which was then selling at between five and six dollars per share. This action arises from plaintiffs' allegations that the individual defendants and Mastercraft manipulated the price of the stock by disseminating to the public false and misleading information concerning the business prospects of the corporation. Plaintiffs seek to recoup their losses, basing their theory of recovery on Sections 10(b) and 27 of the

Securities Exchange Act of 1934, 15 U. S.C. §§ 78j(b) and 78aa (1971), and Securities Exchange Commission Rule 10b-5 (17 C.F.R. 240.10b-5) thereunder.

I. Mastercraft, a Delaware corporation, was formerly known as First Standard Corporation ("First Standard"), a public corporation whose stock was being traded over-the-counter. Defendant Dayon was chairman of the board of directors of Mastercraft and was its largest stockholder. Defendant Gluskin, an attorney, was the secretary of Mastercraft and was also a director.

In January, 1968, First Standard acquired the assets of Mastercraft Electronics Corporation, a private family-owned New York corporation ("Mastercraft, N. Y."). First Standard then changed its name to Mastercraft.

In order to raise capital for Mastercraft, defendants issued over 200,000 shares of common stock of Mastercraft to its employees, who were formerly employees of Mastercraft, N. Y., and who had each owned a small percentage of the private corporation.[1] Although this stock was not registered with the Securities and Exchange Commission as required by Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (1971), and it bore a legend restricting its resale without compliance with that Act, Gluskin wrote a letter advising Mastercraft's transfer agent that the stock could be reissued to the employees without the legend, and it was so reissued. The employees endorsed the reissued stock certificates in blank and surrendered control of them to Gluskin, who delivered them to broker dealers. A substantial number of these unregistered shares were then sold to the public.

The proceeds of these sales were placed in a bank account in Gluskin's name. The employee record holders received an amount sufficient to pay the taxes assessed against them on the sale. Gluskin kept a portion of the money himself, and the rest of the proceeds were turned over to Mastercraft.

At trial Gluskin asserted that the employees were at all times the beneficial owners of the stock and that the sales were exempted from the Securities Act's requirement of registration. Nevertheless, in connection with these transactions Gluskin and Dayon were indicted in January, 1971 (71 Cr. 57). Subsequently, Gluskin pleaded guilty to an information, and before Judge Frankel on December 23, 1971, the following colloquy transpired:

> The Court: In other words, the new company was taking this money and then using it for its corporate purposes, and would it be fair to say that the naming of these receiving and shipping people was a fake?
>
> The Defendant: Yes
>
> .   .   .   .   .   .
>
> The Court: It wasn't really their stock?
>
> The Defendant: That's right.

In addition, Dayon pleaded guilty to Count One of the indictment.[2] At the time of the taking of his plea on October 1, 1971, he stated: "I knew that by giving stock to these nominees that I was doing wrong." [3]

In order to facilitate the sale of the unregistered Mastercraft stock defendants prepared and sent a letter to share-

---

1. Each employee owned between ¼ and 1 share out of 100 total shares.

2. Count One alleged that defendants committed the previously discussed acts as well as the substance of a 10b–5 violation as described, *infra.*

3. The Securities and Exchange Commission also commenced a civil action against de-fendants for the above-described conduct, 68 Civ. 3279, and for creating a market in the Mastercraft shares. *See, infra.* Defendants consented to a final judgment of permanent injunction without admitting or denying the allegations contained in the complaint.

holders ("the shareholder letter").[4] This letter was misleading and was sent for the express purpose of "making a market" for the stock. The misrepre-

4. The shareholder letter which is dated April 24, 1968 reads as follows:

Dear Shareholder:

As you know, First Standard Corp. (Delaware) acquired the assets of Master-Craft Electronics Corp. (New York) in January, 1968 and changed its name from First Standard Corp. to MasterCraft Electronics Corp.

Business is being conducted from the above premises under MasterCraft's new management and personnel.

Our fiscal period is from March 1st to February 28th and the annual report is now being prepared and will be forwarded to you when completed. Pending the issuance of this report, and in order to answer the many requests for information, we would like to give you an idea of what has transpired since January, 1968.

MasterCraft Electronics Corp. (New York) was a manufacturer and developer of electronic consumer products (about 65 in number), such as television, radios, phonographs, walkie-talkies, tape-recorders, and inter-coms. In 1967 we did a volume of $1,685,000.00.

Our 1968 line has been upgraded and includes several new items such as a solid state 8 track stereo tape cartridge portable ($29.95 retail), a capstan tape-recorder with a built-in AM–FM radio capable of recording any broadcast by the press of a button ($99.00 retail) and an 8 track car stereo unit ($39.95 retail).

Since the introduction of our new product line, our first quarter sales promotion and the expansion of our marketing areas, the following comparisons are noted:

ORDERS BOOKED *

| | 1967 | 1968 | + — % |
|---|---|---|---|
| JANUARY | $137,000.00 | $151,000.00 | +10% |
| FEBRUARY | 123,000.00 | 300,000.00 | +144% |
| MARCH | 177,000.00 | 453,000.00 | +155% |
| FIRST QUARTER— | $437,000.00 | $904,000.00 | |

* Excluding Video Recording System orders

The reason for Master-Craft's decision to sell its assets to First Standard Corp. was the fact that we wanted to broaden our field to encompass the Video Recording System that First Standard Corp. had developed, using ordinary audio tape. Mr. Al Dayon, the Chairman of our Board of Directors made a trip to Japan with a prototype of this Video-Recording System for the purpose of resolving production performance. After a full and detailed investigation he came to the conclusion that Maruwa Electronics & Chemical Co. Ltd., one of Japan's well-known electronic manufacturers, was capable of producing the Video-Recording System developed by First Standard in reasonable volume at a cost that would enable us to retail the Camera, Monitor and Tape-Recorder for less than $700.00, which is about half the cost of competitive models.

Maruwa has indicated to us that it has tooled up and is prepared to produce 500 units in the month of May, 1968 and expects that subsequent production will be substantially greater but cannot at the present time be specific in regard thereto.

Since Mr. Dayon's return from Japan our engineers have increased the proficiency of the Video-Recording System, which will be reflected in the first deliveries to be made.

For the past three months we have invited members of the trade to view the performance of the Video-Recording System at our premises and we have also undertaken to demonstrate same in many parts of the country. We have received written commitments for our Video-Recording System in excess of $1,500,000.00 to be shipped as received from Japan. An unusual delay in delivery from Japan can result in some cancellations.

sentations and omissions in this letter were legion.

James Farnell, who signed the shareholder letter, was the president and sales manager of Mastercraft. He testified that the orders booked for the first quarter of 1968 as represented in the letter were grossly overstated. He indicated that the orders for January were added to those of February and the sum was listed as February's orders. The same procedure, adding the previous month's total to the orders for the current month, was used again in March. Thus, the first quarter total was inaccurate and misleading. Although Dayon contends that this "error" in calculation was attributable only to a mathematical mistake by Farnell, and that he was unaware of the miscalculation, the argument is not persuasive. It is inconceivable that Dayon, the chairman of the board of directors, did not know, or should not have known, of this error.

In addition, the letter falsely represents the imminency of the marketing of a video-recording system. First, the written commitments for the system were only $358,000, not $1,500,000 as stated. Second, the system had not been adequately tested. Third, mass produc-

tion of the system had not been ordered. Fourth, Mastercraft was able to obtain a letter of credit for only twenty units. These were the only units received in 1968.

The result of these misrepresentations and omissions was to distort the prospects of marketing the video-recording system by Mastercraft in 1968, thereby making the prospective purchase of Mastercraft stock appear more attractive than it actually was.

■ At trial defendants did not seriously contest the nature of these untruths; rather, their defense was that plaintiffs did not prove that the letter was mailed to shareholders. Defendants did not offer proof that the letter was not mailed, but testified that they could not "recall" having seen the letter themselves and did not know whether such a letter was ever mailed.

It is at best unusual that the chairman of the board of directors and secretary of a corporation were not familiar with whether a shareholder letter was prepared and mailed. Nevertheless, defendants' frequent lapses of memory during the course of this trial can only be termed convenient.[5] After hearing

We have expanded our sales force nationally to include the west coast area, southwest area and midwest area, none of which was heretofore covered by us.

Our 1968 line of consumer-products will begin to arrive in May and should steadily grow for the balance of the year.

Under the aegis of a dedicated and progressive management team, we look forward to a favorable 1968.

Very truly yours,
JAMES S. FARNELL,
President.

---

5. The following are only examples of what occurred throughout the trial:

When asked if he had ever seen Mastercraft's financial statement for the fiscal year ending in February, 1968, Gluskin stated, "I never said that I had never seen it. I just don't have any recollection of having seen it. I have seen so many papers."

Gluskin also testified to checking the "English language employed, to see that the flow of language was reasonably in-

telligent and understandable" in the shareholder letter.

However, when asked for identification purposes whether he had ever seen the letter, he stated, "I can't say that this specific exhibit was seen by me but I am familiar with the fact that we were talking about the substance of it."

When asked by plaintiffs' counsel whether he had seen the financial statement, Dayon said that he recalled seeing it and that it was a report prepared by Master-

defendants' testimony and observing their demeanor at this trial and comparing their testimony with their statements at previous Court appearances,[6] the Court concludes that the testimony given by defendants in their own behalf can be afforded little weight.

On the other hand, Farnell testified that he knew the letter went out to the shareholders. In addition certain of the plaintiffs and one of the plaintiffs' witnesses testified to having seen and discussed the letter.[7] Also, defendants did make comments which indicate that the letter was prepared and sent out. For example, Dayon recognized that "something like" the letter was being prepared by Farnell and Gluskin, and Gluskin knew that the letter was to be used to inform the shareholders of Mastercraft of the operation of Mastercraft's business. Under these circumstances, I find that the letter was mailed, was received by the shareholders, and contained numerous misrepresentations.

█ The shareholder letter also caused the market in Mastercraft to be artificially inflated. Plaintiffs produced Martin Whitman, who is associated with a member firm of the New York Stock Exchange, and is the author of numerous articles on securities and corporate problems. Whitman also has given lectures in these areas and is presently giving lectures at Yale University. He also has acted as a consultant to the SEC. Finally, Whitman was qualified as an expert witness in this Court on previous occasions. I find him fully qualified as an expert in this action.

Whitman examined a financial statement of Mastercraft for the fiscal year ending February 20, 1968.[8] Based on his examination of this statement, Whitman testified that the market value of Mastercraft was "nil or nominal." He observed that Mastercraft's current liabilities exceeded its current assets, its working capital position "was negative and consisted almost entirely" of factored inventories, it had only "nominal" sales for the year ending February 28, 1968, and had reported a deficit of over $109,000.

Whitman believed that the shareholder letter had an important impact on the market price of Mastercraft because the letter gave the impression that Mastercraft was in a growth trend, had a "hot new product," and could enter new areas "on an attractive competitive basis." In fact, Whitman believed that "virtually all of the market value of Mastercraft in 1968" was due to the shareholder letter.

█ On the basis of Whitman's testimony, and in the light of defendants' guilty pleas to the market manipulation charges,[9] the Court finds that the Mas-

---

craft's accountants for Mastercraft. However, after a recess, on voir dire, Dayon was unable to "recall" if his accountants prepared balance sheets for Mastercraft, he "wasn't sure" if Mastercraft had other accountants, and did not "recall" seeing the financial statement "before today".

Both defendants also did not "recall" relating the nature of the wrongful acts they committed to Judge Frankel, who took their guilty pleas.

6. For example, at the taking of Gluskin's guilty plea on October 4, 1971, Gluskin related the events of the scheme in great detail. Judge Frankel termed his statements a "fairly lucid account". However, at trial, less than two years later, Gluskin said he had no recollection of the nature of the charges to which he pleaded guilty.

7. See Section IIA, *infra*, relating to reliance.

8. Dayon identified this statement as being authentic. See note 4, *supra*.

9. At the taking of his plea, Dayon stated that another named defendant in the indictment, not a party to this proceeding, was paying off brokers "to make a market" for the Mastercraft stock.

Defendants contend that the indictment and information and the judgments of conviction by plea of guilty are not competent evidence in this proceeding. The prevailing view is otherwise. See 1B Moore's Federal Practice ¶ .418 at 2706 (1965). The Court considers the pleas of guilty as admissions which are fully admissible in this proceeding.

At any rate, the Court has determined that sufficient evidence was presented to find that defendants are liable to plaintiffs fully apart from any consideration of the guilty pleas.

tercraft shares in 1968 were virtually worthless.

■■ II. The Court has determined that all of the elements necessary for liability under Rule 10b–5 are present here. The Rule provides that it shall be "unlawful for any person, directly or indirectly," (1) "To employ any device, scheme, or artifice to defraud," (2) "To make any untrue statement of a material fact" or to omit to state a material fact so that the statements made "in the light of the circumstances," are misleading, and (3) "To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741, rehearing denied, 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692, rehearing denied, 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972). The purpose of the rule is "to achieve a high standard of business ethics in the securities industry." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963).

A. Defendants Gluskin and Dayon have violated Rule 10b–5 in all three of its enumerated provisions. Defendants' activities, discussed previously, constituted a "course of business" or a "device, scheme, or artifice" which operated as a fraud upon these plaintiffs. *Affiliated Ute Citizens, supra.* The evidence is clear that defendants willfully misrepresented the truth in creating a market for their stock. See Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973). Their activities were calculated to influence the investing public to purchase shares. *Cf.* Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969); S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968), 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), rehearing denied, 404 U.S. 1064, 92 S.Ct. 733, 30 L.Ed.2d 753 (1972).

■■ In addition, investors such as plaintiffs, were entitled to full disclosure of the business prospects of Mastercraft which would be material to a decision whether to purchase Mastercraft shares. *See,* Republic Technology v. Lionel Corp., 483 F.2d 540 (2d Cir. 1973). Defendants were also under a duty to disclose accurately and honestly those prospects in the shareholder letter. The misrepresentations and omissions were material because a reasonable investor might have considered them important in the making of his decision. *Cf.* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The failure to disclose material information accurately which defendants were under a duty to disclose establishes the requisite element of causation in fact. *Affiliated Ute Citizens, supra,* 406 U.S. at 154, 92 S.Ct. 1456.

■ Defendants contend that privity between buyer and seller is necessary under 10b–5. This is simply not the law. In New Park Mining Co. v. Cranmer, 225 F.Supp. 261, 266 (S.D.N.Y.1963), the Court stated,

> A purchaser or seller of stock is not limited under Section 10(b) and Rule 10b–5 to an action against the other party to the purchase or sale; he can sue a third person if in connection with the purchase or sale that person defrauded him.

See also, Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); Kuehnert v. Texstar Corp., 286 F.Supp. 340, 345 (S.D.Tex.1968), aff'd, 412 F.2d 700 (5th Cir. 1969).[10]

Defendants also contend that reliance on the misrepresentations and omissions is necessary and that plaintiffs did not establish this element of their cause of action at trial.

---

10. Plaintiffs have not pressed Count I of their complaint based on Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, because of their inability to demonstrate that the shares they purchased were those which were illegally sold by defendants.

■ It is not clear to what extent reliance is still an element in 10b–5 actions. Although some cases have talked in terms of reliance, List v. Fashion Park, 340 F.2d 457 (2d Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L. Ed.2d 60 (1965); Heit v. Weitzen, *supra*, 402 F.2d at 913; at least in cases concerning a failure to disclose, affirmative reliance no longer must be demonstrated. *Affiliated Ute Citizens, supra,* 406 U.S. at 153, 92 S.Ct. 1456; Lanza v. Drexel & Co., *supra*, 479 F.2d at 1320. This is based on the now accepted view that reliance has little rational role in non-disclosure cases. See 2 Bromberg, Securities Law—Fraud: SEC Rule 10b–5 at 209 (1967). "The proper test is whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." List v. Fashion Park, *supra*, 340 F.2d at 463.

■ In addition, some decisions in "misrepresentation" cases indicate that reliance may be inferred "from the totality of circumstances." Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L. Ed.2d 120 (1965); Kahan v. Rosenstiel, 424 F.2d 161 (1st Cir. 1970); Gerstle v. Gamble-Skogmo, Inc., 298 F.Supp. 66, 98 (E.D.N.Y.1969). Nevertheless, reliance is still generally required in misrepresentation cases.

■ Although the shareholder letter here primarily consisted of misrepresentations, plaintiffs bought shares of Mastercraft on the open market. The reliance requirement also appears to have little relevance under these circumstances. Plaintiffs argue, and this Court accepts the view, that had defendants not engaged in "making a market" for Mastercraft stock, plaintiffs certainly would not have purchased the stock at the artificially inflated price.

One commentator considers the reliance requirement unfair to investors:

It would . . . be unfair (to demand reliance in open market trades) since an investor who trades with reference to market price and conditions may be affected by the misstatement although he never hears it. This difficulty might be overcome by saying that he has relied indirectly. 2 A. Bromberg, Securities Law—Fraud: SEC Rule 10b–5 at 212 (1967).

The Court concurs in this view. Demonstrating reliance in open market situations such as here should not be necessary. Plaintiffs should be required only to demonstrate a material misstatement by defendants. See, Note, Reliance Under Rule 10b–5: Is the "Reasonable Investor" Reasonable? 72 Col.L.Rev. 562, 576 (1972).

To the extent that demonstrating reliance is still required under present law, there is sufficient evidence that it exists here. Plaintiffs' witness Salvatore Nicolosi, a New York City detective, testified that upon his recommendation his parents purchased Mastercraft shares. He testified that he first learned of Mastercraft in the latter part of May, 1968, after having been given a letter by an ex-partner which described Mastercraft and its financial status. Nicolosi identified the shareholder letter as being "very similar" to the letter he saw in 1968. In addition, he discussed the letter with approximately twelve to fifteen other persons. In fact, almost all of the plaintiffs testified that they learned of Mastercraft through Nicolosi.

The evidence presented satisfies the Court that the primary impetus behind the purchase of Mastercraft shares by these plaintiffs was the misleading shareholder letter circulated by defendants.

■ B. The liability of the corporation is co-extensive with that of Gluskin and Dayon. *Affiliated Ute Citizens, supra,* 406 U.S. at 154, 92 S.Ct. 1456, 31 L.Ed.2d 741.

■ C. The proper measure of damages to plaintiffs who have not sold their stock is the purchase price of the stock. See 2 A. Bromberg, supra at 226 (1967). Thus, plaintiffs may recover their entire purchase price and interest

from the date of purchase. Plaintiffs who sold their stock may recover the difference between their purchase price and the price at which they sold their shares. Chasins v. Smith, Barney & Co., 305 F.Supp. 489 (S.D.N.Y.1969), aff'd, 438 F.2d 1167 (2d Cir. 1970). They may recover interest on the entire purchase price from the date of purchase until the date of sale, and interest on the difference from the date of sale.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52; Fed. R.Civ.P.

Settle judgment on note.