**CARLISLE VENTURES, INC.,**
**Plaintiff–Appellee,**

v.

**BANCO ESPAÑOL DE CRÉDITO,**
**S.A., Defendant–Appellant.**

**Docket No. 98–7869.**

United States Court of Appeals,
Second Circuit.

Argued March 12, 1999.

Decided May 14, 1999.

---

---

John F. Collins, New York, N.Y. (Kathryn C. Ellsworth, Gabriela Perez–Marques Baron, Dewey Ballantine LLP, of counsel), for Plaintiff–Appellee.

Wendy E. Ackerman, New York, N.Y. (Jerome S. Fortinsky, Stephen J. Marzen, Roland G. Schroeder, Shearman & Sterling, of counsel), for Defendant–Appellant.

Before OAKES and WALKER, Circuit Judges, and KEITH,* Circuit Judge.

OAKES, Senior Circuit Judge:

## I. INTRODUCTION

In August 1993, plaintiff-appellee Carlisle Ventures, Inc. (Carlisle) purchased more than two million shares of common stock of defendant-appellant Banco Español de Crédito (Banesto) at 1900 pesetas per share. Spain's central bank later determined that Banesto was financially unstable, took control of Banesto, and completely restructured the bank. The value of the Banesto stock fluctuated for several years, and Carlisle finally sold the stock in 1998 for 1930 pesetas per share. Carlisle sued Banesto on several grounds, including breach of contract. The United States District Court for the Southern District of New York (Sotomayor, *J.*) granted summary judgment to Carlisle on the breach of contract claim and awarded Carlisle more than 4.6 billion pesetas—approximately $31.2 million—in compensatory damages. Banesto appeals. Because Spanish law does not support the measure of damages awarded by the district court, we reverse and remand for a recalculation of damages.

## II. BACKGROUND

### A. Facts

Defendant-appellant Banesto is a Spanish banking corporation and the holding company for a group of companies engaged in a variety of industrial, retail and commercial banking activities. In August 1993, plaintiff-appellee Carlisle purchased more than two million shares of common stock valued at 3,899,995,100 Spanish pesetas (approximately $27.5 million) at a price of 1900 pesetas per share from Banesto. The Share Subscription Agreement contained clear representations and warranties concerning Banesto's financial condition, and Banesto promised to indemnify Carlisle for any damages should Banesto breach these representations and warranties. Although this agreement clearly stated that Banesto would indemnify Carlisle in the event of a breach on Banesto's part, it did not specify how such damages were to be calculated in the event of a breach.

In December 1993, Spain's central bank, the Bank of Spain, announced that Banesto had a massive and previously undisclosed deficiency in its capital structure that threatened Banesto's continued viabil-

---

* Honorable Damon J. Keith, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

ity. The Bank of Spain then assumed control of Banesto, replaced its management, and directed its new management to devise a restructuring plan. Market trading of Banesto stock was suspended until February 1, 1994, although there was unmonitored trading of Banesto common stock in the "grey market," at prices ranging from 640 to 690 pesetas per share.

By March 26, 1994, the restructuring plan was approved by the Executive Board of the Bank of Spain and Banesto shareholders. The plan called for, among other things, a capital increase of 180 billion pesetas though the sale of 450 million shares of Banesto common stock to the Spanish Deposit Guarantee Fund (FGD)[1] at a price of 400 pesetas per share. The restructuring plan further provided that the FGD would sell the 450 million shares at a public auction, and that the winning bidder, in turn, would be required to offer 81 million shares to existing shareholders at the price of 400 pesetas per share.

This capital increase was carried out, and Banco Santander purchased the shares at the public auction for 762 pesetas per share in April 1994. As required by the restructuring plan, Banco Santander announced in September 1994 that it would offer Banesto shareholders the opportunity to purchase Banesto shares at 400 pesetas per share (the "Rights Offering"). The Rights Offering took place during the first half of October 1994, with payment for the shares due on October 21, 1994. At this time, Banesto shares were trading at 860 pesetas per share. Carlisle did not participate in the Rights Offering. Between January and February 1998, Carlisle sold all of its shares at an average price of 1930 pesetas per share.

### B. *Litigation*

In August 1994, Carlisle sued Banesto on five different grounds relating to the stock purchase, including breach of contract. The United States District Court for the Southern District of New York (Sotomayor, *J.*) granted Carlisle's motion for summary judgment on the breach of contract claim and held a bench trial to determine damages. *See Carlisle Ventures, Inc. v. Banco Espanol De Credito, S.A.*, No. 94 Civ. 5835, 1996 WL 680265 (S.D.N.Y. Nov.25, 1996). Both parties offered experts as to the Spanish law that governed the dispute. One of Carlisle's experts, a Spanish attorney, asserted that Carlisle was entitled to the difference between what Carlisle paid for the stock and what it was actually worth at the time of purchase. Banesto's expert, a Spanish attorney and law professor, contended that Carlisle was not entitled to such damages and that Carlisle had an affirmative duty to mitigate its damages.

The district court adopted Carlisle's position and awarded Carlisle more than 4.6 billion pesetas—approximately $31.2 million—in compensatory damages. This award was calculated as the difference between the price Carlisle paid for the stock and the hypothetical "true value" of the stock at the time of purchase. The court also held that Carlisle had no duty to mitigate its damages. Banesto appeals.

### III. *DISCUSSION*

Banesto raises three arguments challenging the district court's award of damages. First, it contends that the district court's award, which was based on the difference between the price Carlisle paid for the stock and the true value of the stock at the time of purchase, was improper under Spanish law. Second, it argues that even if Spanish law allowed an award of damages calculated in this manner, the district court erred when it found that Banesto's stock was worth only 350 pesetas per share in August 1993. Third, it contends that the district court erred in failing to enforce Carlisle's obligation to

---

1. Pursuant to Bank of Spain regulations, the FGD may purchase doubtful loans or may acquire, recapitalize and then sell banks that experience serious difficulties.

mitigate its damages. We consider each issue in turn.

### A. *Measure of Damages*
#### 1. *Difference between purchase price and "true value" at time of purchase*

■ The parties dispute whether the district court's award, which was calculated as the difference between the price Carlisle paid for the stock (1900 pesetas per share) and the true value of the stock at the time of purchase (determined by the district court to be 350 pesetas per share), was permissible under Spanish law. We review the district court's calculation of damages under Spanish law *de novo*. *See Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir.1998) ("[P]ursuant to Fed.R.Civ.P. 44.1, a court's determination of foreign law is treated as a question of law, which is subject to *de novo* review."). In interpreting and applying Spanish law, we may consider any relevant material or source, including the legal authorities supplied by the parties on appeal as well as those authorities presented to the district court below. *See id.* at 12–13 (citing 9 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* §§ 2444–446, at 644–58 (3d ed.1995)).

Banesto argues that the district court's approach was impermissible under Spanish law. According to Banesto, Spanish law limits recovery to a plaintiff's actual pecuniary loss, and Carlisle suffered little or no pecuniary loss because it sold its Banesto shares at a modest profit. Under this theory, Carlisle can recover nothing because it recouped its initial investment. In the alternative, Banesto concedes that Carlisle may recover the interest on the August 1993 purchase price as an element of the "lost profits" that Carlisle did not earn while its money was invested or tied up in the Banesto stock. Carlisle, of course, defends the district court's measure of damages as entirely appropriate.

Both parties agree that the damages award in this case is governed by Articles 1101 and 1106 of the Spanish Civil Code. Article 1101 provides that "[t]hose who, in the performance of their obligations, incur in fraud, negligence, or delay, and those who act in contravention of the provisions of the obligation, are liable for the resulting damages." C.C. Art. 1101, *translated in Civil Code of Spain* 274 (1994). Article 1106 provides that "[r]eparation in damages shall comprise not only the value of the loss sustained, but also that of the profits that the creditor failed to obtain. . . ." C.C. Art. 1106, *translated in Civil Code of Spain*, at 275. Although both Articles contemplate that damages may be awarded, they do not specify how those damages are to be calculated.

■ In our view, the Spanish law provided to us by the parties on appeal simply does not address how to measure the damages available to a buyer who purchased securities due to the seller's misrepresentations when that buyer subsequently sold the securities at a modest profit. The Spanish law evidence cited by the district court—the affidavit of Bernando Cremades, a prominent Spanish attorney and former law professor—provides only very limited support for this measure of damages, as Cremades' declaration cites no cases or legal authority to support his construction of Articles 1101 and 1106. In addition, Carlisle cites no Spanish cases that employ this particular remedy under Articles 1101 and 1106. Rather, Carlisle contends that Spanish courts have discretion to fashion damage awards as they see fit.

Carlisle further argues that the Spanish Civil Code governs only in the absence of a special agreement by the parties, and that the district court's award was proper because Banesto expressly agreed to indemnify Carlisle if Banesto breached the contract. But this express indemnification provision sheds no light on the proper measure of damages to be used, because the agreement failed to define how such

damages were to be calculated in the event of a breach.

In short, because the district court's award was insufficiently supported by Spanish law, we cannot uphold it.

We also find no support for the district court's measure of damages under law from this jurisdiction. Several federal court cases suggest that Carlisle's recovery must be limited because it sold the Banesto shares for more than the purchase price. Although these cases involved claims under the federal securities laws, rather than breach of contract claims, in our view it is appropriate to consider these cases because Carlisle's breach of contract claim arises from a contract for the sale of securities.

For example, in *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 57 (2d Cir. 1984), the Barrowses sold their manufacturing business for shares in Forest Laboratories, Inc. Their business was then valued at $550,000. *See id.* at 56. The sale agreement contained a complicated mechanism under which the number of Forest shares received by the Barrowses could be adjusted based on a rise or fall in the market value of the stock within two years after the date of the agreement. *See id.* Eight years later, Forest disclosed that their officers had intentionally misrepresented Forest's financial condition. *See id.* The Barrowses, who continued to hold their stock, sued Forest, alleging that "the stock they received for the sale of their business was worth substantially less than its represented value." *Id.* The Barrowses sought damages for the difference between the value of what was bargained for and the value at the time of what was received; that is, they wanted 335,355 additional shares, "the number of shares that would have been necessary to pay the Barrowses $550,000 if the stock, at the time of the sale of their business, had been valued at its 'true' value of $1.50 per share." *Id.* (This is identical to the relief sought by Carlisle.) In the meantime, however, Forest began to show "substantial earnings improvements," and the Barrowses sold their Forest stock for about $748,000. *Id.*

The district court in *Barrows* declined to award the relief requested by the Barrowses in part because the determination whether the parties would have entered into any agreement if the stock's alleged true value had been publicly disclosed at the time of the sale would require "undue speculation." *Id.* at 57. Instead, the court limited the damages to the difference between the value of the business and the proceeds from the Barrowses' sale of the Forest stock; that is, the difference, if any, between the price paid and the price received on resale. *See id.*

We affirmed. We agreed with the district court that the relief requested by the Barrowses required undue speculation, stating that, "[a] claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different." *Id.* at 60. We further reasoned that the Barrowses did not suffer compensable damages: "[t]he issue is not whether appellants were entitled to assume that the market price of the Forest stock in 1969 reflected Forest's true financial condition, but instead whether they have suffered legally compensable damages as a result of the fact that it did not." *Id.* Under *Barrows*, then, buyers who purchase stock that is allegedly overvalued due to the seller's misrepresentations and subsequently sell the stock suffer no legally compensable damages where the proceeds from that sale exceed the price paid for the stock.

■ If we apply *Barrows* to the instant case, we may fairly state that the issue here is not whether Carlisle was entitled to assume that the market price of the Banesto stock in 1993 reflected Banesto's true financial condition, but instead whether Carlisle has suffered legally compensable

damages as a result of the fact that it did not. Because Carlisle recognized a profit from the sale of the Banesto stock, Carlisle did not suffer compensable damages entitling it to recover the difference between the purchase price and the "true value" of the Banesto stock at time of purchase. In addition, it is unduly speculative to decide whether Carlisle would have invested in Banesto had Banesto truthfully disclosed its financial condition. By awarding the difference between the purchase price and the hypothetical "true value" of the Banesto shares at the time of purchase, the district court essentially awarded Carlisle the profits that Carlisle would have made if Banesto had fully disclosed its financial situation and Carlisle invested in Banesto anyway, at the price of 350 pesetas per share. This award, which contemplates that Carlisle would have invested in Banesto had Banesto truthfully disclosed its financial situation, does not comport with Carlisle's statements in the court below and on appeal that it would not have invested in Banesto had it known of Banesto's financial distress. Yet, Carlisle defends this measure, arguing that

> [i]f Carlisle had paid the true 350 pesetas per share value for Banesto's shares in August 1993, it would have acquired over five and one-half times the shares Banesto sold to it and would have been able to sell those shares in 1998 at 1900 pesetas per share. That lost opportunity is the real measure of the damages Carlisle has suffered as a result of Banesto's deception.

In our view, Carlisle's defense of such an award squarely contradicts Carlisle's concession in the court below and on appeal that it would not have invested in Banesto had it known of Banesto's financial distress. Given this concession, it is especially inappropriate to award Carlisle the profits it would have reaped had it invested in the less expensively priced stock. Such an award amounts to a windfall for Carlisle.

Another analogous case is *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608 (2d Cir.1994). The plaintiffs there invested $10.5 million in a limited partnership fund formed by Ivan Boesky. *See id.* at 610. Boesky was subsequently indicted for insider trading and a liquidation trustee was appointed for the partnership. *See id.* Plaintiffs filed a federal securities action, seeking to recover their capital investments and claiming that they would not have purchased their security interests had they known about any underlying criminal activity. *See id.* at 610–11. Four years later, while the suit was still pending, the plaintiffs began to receive cash payments resulting from their ownership of partnership interests as well as proceeds from a third-party settlement. *See id.* at 611. They recouped 114.6 percent of their initial investment and continued to hold their partnership interests. *See id.* We reasoned that the plaintiffs had "actually suffered no out-of-pocket loss since their investments were fully repaid, with interest. Thus, while we have no difficulty in finding that plaintiffs' causes of action might well subject defendants to liability, plaintiffs can prove no damages." *Id.* at 609.

Like the *Milken* plaintiffs, Carlisle can prove no damages because it sold the Banesto stock for a profit. Carlisle distinguishes *Milken* on the grounds that the investors in that case retained their partnership interests, whereas Carlisle no longer holds the Banesto stock. But, as Banesto counters, the fact that the plaintiffs retained their interests in a liquidating partnership was not critical to our holding; rather, our central concern in *Milken* was that the plaintiffs had suffered no direct pecuniary losses because they had recouped their entire initial investment as well as a return on their investment. *See id.* at 612–15.

Our holding in *Milken* was also influenced by the fact that the plaintiffs were "fully aware" at the outset that the Boesky partnership was an extremely risky invest-

ment. *Id.* at 614. In our view, Carlisle was similarly apprised of the risk of investing in.Banesto at the time it purchased the Banesto shares. The Information Memorandum issued by Banesto as part of its offering materials stated that "[a]s of December 31, 1992, the regulatory capital of the Banesto Group did not satisfy the Bank of Spain's capital adequacy requirements," and that there was a potential for further deterioration of asset quality as a result of the growth of unpaid or doubtful loans. The Information Memorandum also informed investors that the Bank of Spain "had not permitted a large Spanish bank to default or cause losses for depositors or general creditors in 70 years."[2]

Under *Barrows* and *Milken,* Carlisle did not suffer compensable damages because it recouped its entire investment as well as a small profit, when it resold the Banesto shares. *See also Reeder v. Mastercraft Elecs. Corp.,* 363 F.Supp. 574, 581–82 (S.D.N.Y.1973) (plaintiff-buyers of common stock prevailed in a securities fraud action brought to recoup their losses; in determining the proper measure of damages, the court stated that plaintiffs who had not sold their stock were entitled to recover the entire purchase price, whereas plaintiffs who had sold the stock could recover only the difference between the purchase price and the resale price). Although Carlisle cites several cases in which United States courts have awarded damages for "out-of-pocket" losses, it has cited no case in which a court awarded a purchaser of shares the difference between the purchase price and the actual "true value" of the shares at the time of purchase when the purchaser had already sold the shares at a profit. We therefore conclude that United States law does not provide adequate support for the district court's award.

### 2. *Interest on purchase price*

■ Because we have concluded that neither Spanish law nor United States law provides adequate support for the district court's award, we next consider the proper measure of damages in a breach of contract action under Spanish law where a purchaser overpays for stock and later sells the stock at a modest profit. Banesto concedes that Spanish law may entitle Carlisle to recover the interest on the August 1993 purchase price "in order to compensate [Carlisle] for the time value of the money invested." We hold that this is a defensible measure of damages.

As stated above, Article 1106 of the Spanish Civil Code expressly provides that a creditor may recover damages for the profits that it failed to obtain, but does not specify how such damages should be calculated. *See* C.C. Art. 1106, *translated in Civil Code of Spain,* at 275 ("Reparation in damages shall comprise not only the value of the loss sustained, but also that of the profits that the creditor failed to obtain. . . .") Article 1108 expressly contemplates that a person may recover damages consisting of interest on the money paid by that person, when the "debtor" defaults on an obligation. It states that "[i]f the obligation involves the payment of a sum of money and the debtor were in default, liability in damages, in the absence of a contrary agreement, consists in the payment of the interest agreed upon and, in the absence of an agreement concerning interest, in the legal interest." C.C. Art. 1108, *translated in Civil Code of Spain,* at 275. In our view, it is plausible and reasonable to read Articles 1106 and 1108 together to allow Carlisle to recover interest on the purchase price paid for the Banesto shares.

Statements by experts who appeared below support this reading of Articles 1106 and 1108. One of the Spanish law experts

---

**2.** The district court found, however, that these statements did not "even hint[ ] at the nature and scope of the mismanagement and false accounting which characterized Banesto's op-

eration at the time of [Carlisle's] share purchase." *Carlisle Ventures, Inc.,* 1996 WL 680265, at *8.

who appeared below—Juan Palau, a Spanish law professor—declared that the measure of damages contained in Article 1108 may cover the lost profits referred to in Article 1106. Carlisle's expert also stated that Carlisle could recover, at minimum, the statutory interest rate on its damages as an element of lost profit under Article 1106.

A case by the Spanish Supreme Court also supports this measure of damages. *See* STS, April 1, 1996 (R.J., No. 2875). In that case, the plaintiff buyer advanced a portion of the purchase price for the sale of real estate. The seller breached the contract and the sale was never completed. *See id.* The plaintiff sought as part of his damages the increase in the property's value between the date of purchase and the date of judgment. *See id.* The court stated that "there are no damages other than those deriving from the retention of the amount delivered as an advance on the price" under Article 1101, and awarded the plaintiff only the interest on that portion of the purchase price it had advanced on the sale. *See id.* To the extent that this case does not feature a buyer who sold allegedly overvalued stock at a profit, it is obviously distinguishable. In our view, however, it nonetheless provides some support for awarding interest as compensation for the time value of the buyer's money as the only damages when the buyer sues the seller for breach of contract and the buyer suffers no other pecuniary losses.

Our own jurisprudence contemplates this measure as well. In *Reeder*, in which the district court awarded damages measured by the difference between the purchase price and the resale price, the court noted that the plaintiff could also recover "interest on the entire purchase price from the date of purchase until the date of sale, and interest on the difference from the date of sale." *Reeder*, 363 F.Supp. at 582.

And in *Milken*, discussed above, we noted that prejudgment interest might be appropriately awarded as a remedy for the plaintiffs' "lack of return on their capital investment" during the four years it took to recoup their investment, although we affirmed the district court's conclusion that the 14.6 percent return received by the plaintiffs was a "suitable prejudgment interest substitute." *Milken*, 17 F.3d at 613–14.

Finally, as Banesto argues, measuring Carlisle's damages by lost interest on the purchase price puts Carlisle in the same financial position it would have been in had the contract not been breached, as Carlisle conceded below that it would not have purchased Banesto stock had Banesto not misrepresented its financial condition. For these reasons, we conclude that the appropriate measure of damages in this case is to award Carlisle interest on the purchase price of the Banesto stock in 1993.

To sum up, we hold that the district court's award was not a proper calculation of damages. We reverse and remand for a recalculation of damages based on the interest on the purchase price paid for the Banesto shares in August 1993.[3]

## B. *Valuation*

Because we conclude that the district court erred when it awarded damages based on the difference between what Carlisle paid and what the stock was actually worth at the time of purchase, we need not consider Banesto's argument that the district court erred when it found that Banesto's stock was worth only 350 pesetas per share when Carlisle purchased it in August 1993.

## C. *Mitigation*

 Banesto also contends that the district court erred in failing to enforce Car-

---

**3.** Banesto contends that calculation of interest on the purchase price from the date of purchase until the date Carlisle resold its stock would yield a maximum damages award

of 1,855,740,013 billion pesetas. Carlisle does not address this issue. This is a question of fact for the district court to consider on remand.

lisle's duty to mitigate by participating in the October 1994 Rights Offering to purchase more Banesto stock. Had Carlisle participated, it could have purchased an additional 1,026,314 shares of Banesto stock from Banco Santander at a below-market price of 400 pesetas per share. Banesto claims that Spanish law required Carlisle to act in an economically and commercially reasonable fashion, and that Carlisle could have realized an "immediate and virtually risk-free profit" had it participated in the Rights Offering.

Carlisle argues that it decided not to participate because, first, it had already been the "victim" of Banesto's fraud and misrepresentations; second, it was currently litigating the question of Banesto's liability for breach of contract; and, third, it was unable to obtain adequate information from Banco Santander to allow it make an intelligent decision to invest again in Banesto. Banesto concedes in its brief that Banco Santander and the Spanish government did not issue any promises or warranties in connection with the Rights Offering.

The district court found that Carlisle did not have an obligation to mitigate its damages under either Spanish law or American law by participating in the October 1994 Rights Offering. *See Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*, No. 94 Civ. 5835, 1998 WL 259928, at *24 (S.D.N.Y. May 21, 1998) (citing Dan B. Dobbs, *Law of Remedies*, at 135 (2d ed.1993) (noting that a breach victim is rarely required to accept a new offer in order to mitigate damages)). The cases cited by the district court amply support this conclusion. *See, e.g., Zanker Dev. Co. v. Cogito Sys. Inc.*, 215 Cal. App.3d 1377, 1382, 264 Cal.Rptr. 76 (1989) ("[I]t is not necessary for a plaintiff landlord to renegotiate another lease with a defendant tenant who has repudiated its original lease and whose lease was terminated by an unlawful detainer judgment even though the tenant offers terms that conceivably result in avoiding loss.");

*Stanley Manly Boys' Clothes, Inc. v. Hickey*, 113 Tex. 482, 259 S.W. 160, 162 (Tex.Com.App.1924) ("We doubt if any man should be required to contract a second time with one who has without cause breached a prior contract with him."). Banesto cites no cases, and we are aware of none, in which a buyer, who purchased stock inflated by the seller's misrepresentations and who subsequently sued the seller for breach of contract, was required to mitigate her damages by purchasing more of the stock that was allegedly overvalued in the first place.

In our view, the district court properly held that Carlisle was not required to mitigate its damages by participating in the Rights Offering. Carlisle's decision not to purchase more Banesto stock is not made unreasonable by the fact that Carlisle might have profited had it done so. As one court has stated, it is appropriate for courts to focus

> not on the failure of the plaintiff to pursue the ... alternative courses of action suggested by [the] defendant but upon the reasonableness of the action which [the] plaintiff did in fact take. "The fact that in retrospect a reasonable alternative course of action is shown to have been feasible is not proof of the fact that the course actually pursued by the plaintiff was unreasonable."

*Zanker*, 215 Cal.App.3d at 1381, 264 Cal. Rptr. 76 (quoting *Green v. Smith*, 261 Cal.App.2d 392, 398, 67 Cal.Rptr. 796 (1968)). We therefore affirm on this issue.

■ Banesto also argues that had Carlisle sold its shares on the open market rather than waiting until early 1998, it would have reduced its damages by more than fifty percent. According to Carlisle, Banesto has waived this argument by failing to raise it below. Banesto does not respond to Carlisle's waiver argument in its Reply Brief, nor does Banesto point to any evidence in the record to prove that it did raise this argument below. We therefore decline to consider it. *See Amalgamated Clothing and Textile Workers Union*

*v. Wal–Mart Stores, Inc.*, 54 F.3d 69, 72–73 (2d Cir.1995) (declining to consider appellant's argument not raised in district court absent a showing of manifest injustice or extraordinary need). Furthermore, this argument—that Carlisle could have mitigated its damages by selling the shares at more than 350 pesetas per share at the time of disclosure of the breach of warranty—is made irrelevant by our decision that the district court should not have relied on the 350 pesetas per share valuation.

## V. CONCLUSION

For the foregoing reasons, we reverse and remand for a recalculation of damages.